BEER, Judge.
This is a wrongful death action by the widow and child of Charles Cheatham. The case against defendants, Daniel J. DeNoux and Stephen Reboul, was tried by jury and resulted in a verdict in favor of plaintiff in her individual capacity in the amount of $529,000 and in her capacity as administra-trix of the estate of her minor son in the amount of $125,000. Simultaneous with the jury trial, the case against the City of New Orleans (hereafter, “City”) was tried by the district judge, who cast the City in judgment for the same amounts.
*148 Other defendants were originally sued but, thereafter, as a result of various motions and exceptions, dismissed. The City, DeNoux and Reboul are the only appellants.
About midnight, April 11, 1975, DeNoux and Reboul, both patrolmen on the New Orleans Police Force, but clearly off-duty and in their civilian clothes, were, with their friend Richard Schilling, out for dinner in the French Quarter. As they walked along Bourbon Street near Toulouse, they were approached by a young shoe-shine boy, who, with some persistence, tried to persuade them to have their shoes shined. The evidence indicates that the boy, miffed because of their indifference, directed various obscenities toward them, and they became irritated. According to plaintiff’s witnesses, Reboul began to manhandle the boy, who, at the trial, testified that Cheatham then came upon the scene and intervened in his behalf. The boy testified that one of the defendants asked Cheatham if he wanted to fight about it and, immediately thereafter, struck the first blow. While he and Cheatham were fighting, the other defendant drew a gun and fired at Cheatham. He testified that Cheatham never had a gun of any other weapon and that defendants never identified themselves as police officers.
A cab driver, Joseph Baker, called by plaintiff, testified that he saw the men manhandling the boy and stated that when he came up to the group to investigate he was told to stay out of it. He says that Cheatham came up at about the same time and was also told to stay out. However, Cheatham told them he was going to make the matter his business. An argument ensued. Then, according to Baker, the following took place: One of the defendants was holding a drink and asked someone to hold it for him, whereupon he struck Cheatham. This witness did not see anyone pull a gun but, as he went to get the keys from his cab parked across the street, he heard a shot. After hearing the shot, he saw Reboul holding up his badge and gun and heard him telling the onlookers to stand back. This, according to all the witnesses called in behalf of plaintiff, was the very first instance of either of the defendants identifying themselves in any way as police.
Witnesses Douglas Gaspard and Alfred Smith essentially confirm the testimony regarding the altercation and the lack of self-identification on the part of Reboul and DeNoux until after Cheatham was shot by Reboul.
DeNoux and Reboul gave this account of the incident: After they warned the shoeshine boy to be on his way and stop annoying them, Cheatham came forward and began to abuse them verbally in an obscene way. They contend that they, thereupon, identified themselves as police but that Cheatham continued to abuse them. They threatened to arrest Cheatham and it appeared that he was going to relent but, instead, struck Reboul in the face and a fight ensued with the two of them scuffling on the ground. During the scuffle, Cheat-ham came up with the gun which Reboul was carrying in his waistband and pointed it at DeNoux, who was a few feet away from them, whereupon DeNoux drew his gun and shot Cheatham.
Defendants sought to corroborate their version of the episode by the introduction of statements from two witnesses obtained by police homicide investigators following the shooting. However, one of these witnesses was found dead soon after the shooting, and the other took the stand and repudiated the statement that he had made to the investigator. Both of these witnesses had long criminal records, which included convictions for felonies.
Ballistics tests established that it was De-Noux’s pistol which fired the bullet which unobjected-to hearsay shows was taken from Cheatham’s body.
The factual issue which the jury was obliged to resolve from the conflicting testimony of these witnesses is clear: Was the shooting justified? The jury, apparently unwilling to accept the testimony of Re-boul, DeNoux and Schilling on this critical issue, accepted the testimony of the witnesses called in behalf of the plaintiff.
There is evidence to support this basic credibility determination by the jury. *149 The preponderance of the evidence — including DeNoux’s admission against interest— supports the conclusion that it was DeNoux who fatally wounded Cheatham. Does this conclusion, coupled with the jury’s obvious determination (which we believe to be correct) that the shooting was unjustified, necessarily liable Reboul? We turn to a consideration of that issue:
LSA-C.C. art. 2324 provides:
“He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.”
 As we see it, the ultimate resolution of this issue turns on the question of foreseeability. As noted in Laird v. Travelers Insurance Company, 263 La. 199, 267 So.2d 714 (1972), every act leading up to an event which is the subject matter of litigation cannot be said to be a cause-in-faet. However, when such antecedent act supports a conclusion that, more probably than not, it was a necessary ingredient of the ultimate event, it then constitutes a cause-in-fact. We believe that the fatal wounding of Cheatham by DeNoux falls outside of that degree of reasonable foreseeability ascribable to Reboul as he scuffled with Cheatham. The record gives no support to a conclusion that Reboul could have reasonably foreseen that his scuffling with Cheat-ham would lead — momentarily—to De-Noux’s bizarre act of fatally shooting an unarmed man.
Though Reboul’s scuffle with Cheatham certainly created a situation where some injury could result, it is, we believe, unreasonable to foresee, from Reboul’s standpoint, death by shooting — at the hands of another. We conclude that the jury, though within its province in its basic determination of liability, erred in casting Re-boul.
Finally, insofar as basic issues of liability are concerned, we conclude that the record supports the jury’s conclusion that Cheatham was not contributorily negligent insofar as that contention has to do with his fatal wounding at the hands of DeNoux even though such conclusion might not be the same had we been dealing only with injuries resulting from the scuffle with Re-boul.
In her individual capacity, plaintiff was awarded the following:
For the pain and suffering of her deceased husband prior to his death $ 50,000
For loss of past earnings and for loss of future earnings of her deceased husband 279,000
For her mental pain and suffering and for her loss of love and affection both past and future 200,000
$529,000.
As administratrix of her minor son, she was awarded $125,000 “for the loss of love and affection of his deceased father and for any future pain and suffering.”
 An appellate court may not disturb an award unless there has been an abuse of discretion by the trier of fact. Smith v. Government Emp. Ins. Co., 358 So.2d 1289 (La.1978). We have concluded in this case that there was an abuse of discretion in the award of $50,000 for decedent’s pain and suffering occurring prior to his death. Plaintiff had the burden of proof and failed to prove that Cheatham was conscious for any time following his being shot. When he was taken to Charity Hospital by the police emergency unit, he was unconscious. He died at Charity Hospital shortly thereafter. No witness, medical or lay, was produced to testify that he was conscious at any point after he was shot.
The award of $279,000 for past earnings and loss of future earnings was based on testimony that past loss of wages amounted to $19,400 for the period from death until the trial, and future loss of wages was $260,000 based upon a 33-year work life expectancy, discounted at 5%, considering such factors as inflation and the future raises in salary and deducting what Cheat-ham himself would consume had he lived. The principal objection by defendants is to the economist’s underlying assumption that the decedent was earning $800 per month at the time of his death. No income tax or employment records were produced, but *150 plaintiff called the local manager of Pitney-Bowes by whom Cheatham had been employed at the time of his death and he stated that someone in Cheatham’s job slot would have been earning $800 per month plus commissions. This evidence was corroborated by plaintiff’s own testimony that her husband was making about $900 a month at the time of his death.
In our view, the principal defect in this $279,000 award is the unsoundness as a matter of law of awarding a decedent’s lost wages. A decedent’s widow and child are not entitled to recover his wages—especially not his before-tax wages—because they never got his wages while he was alive and consequently they have not lost those wages by reason of his death. All that they have lost is the support—if any—that he would have given them out of those earnings and that is the most that they could be entitled to recover. Most important, it is their burden to show that the decedent was supporting them and we find no evidence in the record that he was doing so, other than the fact that decedent had a two-year-old child, which implies that the wife probably stayed home to care for the child and thus did not herself earn an income. (The child is not entitled to his hope of inheritance, Eichorn v. New Orleans & C. R. L. & P. Co., 1905, 114 La. 712, 38 So. 526.) It is thus error to begin with before-tax earnings, and that error is compounded by deducting only 30% (or 26%) on the theory that, statistically, a husband with no children (or with one) devotes 70% (or 74%) of his before-tax earnings to wife (or wife and child) support and to savings (including the savings aspect of home mortgage payments, without any showing whether this decedent was buying a home). The economist did not even discuss whether the amount of the husband’s earnings made a difference—$9,600 as here or $96,000—or whether the wife’s working would be a factor.
The $279,000 award is further defective in that it presumes a three percent increase yearly for promotions and merit pay increases, in addition to increases to keep apace with inflation. There is no evidence to support such a continually recurrent increase. (We recognize also the inconsistency present in holding, first, that a salary-related loss in the future will be twice the number of dollars it is today, because the then dollar will be worth half of today’s dollar, but, second, the judgment obliges the defendant to pay for those 50-cent dollars in today’s 100-cent dollars. Nevertheless, for smaller awards that would not support investment counsel, an unsophisticated plaintiff often has no real investment choice, but must use government-insured accounts in banks or building and loan associations, in which the number of dollars does not increase with inflation. Thus it is not wholly insupportable in smaller awards to increase the award’s number of today’s dollars because tomorrow’s will be worth less.)
We conclude that, despite the lack of direct evidence of loss of support, the record can reasonably justify an award to the widow in the amount of $120,000 (representing an average of about 35% of the husband’s expected earnings until trial and 33 years thereafter, increased by 3% annually for inflation and discounted at 5% to present value), and an award for the child of $35,000 (representing an average of about 25% of the father’s expected earnings during 16 years to the child’s majority (see Eichorn, supra) similarly adjusted for inflation and present value).
We turn to the question of whether or not the awards of $200,000 for plaintiff’s loss of love and affection and $125,000 for her child’s loss of love and affection were within the jury’s discretion.
We have reviewed several recent cases involving awards for loss of love and affection. These cases also provide an insight into the factors which courts should consider in arriving at such awards.
In Ayala v. Bailey Electric Company, Inc., 318 So.2d 645 (La.App. 4th Cir. 1975), we affirmed an award to the 54-year old decedent’s widow for loss of love, companionship and affection in the amount of $25,-000, and to decedent’s son who was a col *151 lege student at the time of his death in the amount of $12,500, noting that the couple had enjoyed a close relationship during their 24 years of marriage and that the father and son had been close.
In Cacibauda v. Gaiennie, 305 So.2d 572 (La.App. 4th Cir. 1974), we affirmed an award of $95,000 to the widow for loss of love and affection, pointing out that the couple were married 27 years at the time of the accident and together with the four children had formed a close knit family group. At the time of his death, decedent was 53 years old and his wife 42, and there was evidence that the widow changed from a congenial active woman to one whose nervous condition caused her to withdraw from many former activities. We likewise affirmed an award of $29,000 to a 15-year-old child and $15,000 for each of the three children over 21.
In Smith v. Manchester Insurance & Indemnity Company, 299 So.2d 517 (La.App. 4th Cir. 1974), we affirmed an award to the widow of $50,000 in circumstances where the couple had been married for 36 years and were close and devoted to each other. At the time of his death, decedent was 57 years of age.
In Aymond v. State Department of Highways, 333 So.2d 380 (La.App. 3rd Cir. 1976), the court affirmed an award of $60,000 to the widow of the 66-year-old decedent under circumstances where the couple had been married for only four years at the time of the accident, but the evidence showed that the couple were devoted to one another and had a happy marriage.
The Cheathams were married on November 13, 1971. At the time of his death, Cheatham was 27 and his wife 22. Their child was born on February 25, 1973. Mrs. Cheatham knew that her husband was going to night school, but she did not know what he was studying. Cheatham was out alone in the French Quarter after midnight when he was killed. His wife testified that “that particular night I really didn’t want to go . . . but he went anyway. . . ” The conclusion is inescapable that the relationship between the Cheathams was not shown to be as close as those in the high-award cases cited.
We feel compelled to conclude that the jury abused its discretion in making excessive awards for love and affection, and, accordingly, reduce them to $50,000 for Mrs. Cheatham’s loss and $25,000 for the child’s loss, these amounts being the upper limits of the jury’s discretion in the matter.[1]
We now turn to a consideration of the liability of the City of New Orleans.
Immediately after the jury verdict was returned, the trial judge made the following comments:
“. . The Court has to decide the case against the City of New Orleans. The Court is of the opinion that the police officers were acting in their duty as police officers during the time and in the scope of their employment as officers and the Court hereby also awards a verdict in behalf of the Plaintiffs against the City of New Orleans. The Court is of the opinion that it has no other choice to do this since they were acting in the course and scope of their employment and the Court certainly feels it would not be fair to leave them in the cold so to speak. That to hold them accountable for this amount of money that the jury has assessed would certainly not be in the best interest of justice and the Court is of the opinion that enough evidence has been put into the record that they were acting in their scope of employment as agents of the City. And the Court is of the opinion it has no choice but to grant the award also on behalf of the widow and minor child against the City of New Orleans.” (Emphasis ours.)
Thus, the trial court found “liability on the part of the city simply because the court certainly feels it would not be fair to leave them (DeNoux and Reboul) out in the *152 cold so to speak . . . and we are unable to accept the trial court’s observation that “It would be anomalous to find the City not negligent. . . . ”
We are of the view that the facts of this case are similar to those discussed in Gautreau v. Davis, et al., 350 So.2d 268 (La.App. 4th Cir. 1977). Here, as in Gautreau, there is a vast difference between the support that exists in the record for the ultimate determination which forms the basis of finding liability on the part of DeNoux and that which can properly form any basis for liability on the part of the City of New Orleans. In Gautreau, we observed that:
“In order for an employer to be held vicariously liable, the employee whose act has caused damage must be reasonably within the course and scope of his employment. Thus, a tortious assault is chargeable against the employer only when the action which forms the basis of the claim is reasonably incidental to the performance of employment duties or in furtherance of the employer’s business and not motivated by hatred or a desire to inflict punishment due to personal antagonisms. See LeBrane v. Lewis, 292 So.2d 216 (La.1974); Strawder v. Harrall, 251 So.2d 514 (La.App. 1st Cir., 1971).”
Likewise, this record does not support a finding of liability on the part of the City on any valid grounds.
The altercation with Cheatham that resulted in his death neither began nor persisted in the course of any action in behalf of the City of New Orleans. The manhandling of the shoe-shine boy and the ensuing argument with Cheatham which led to the heated verbal exchange which quickly led to the physical contact which resulted in Cheatham being shot cannot liable the City simply because DeNoux (or Reboul) is an employee of that entity. Nor can liability come about simply because of a recognized practice of permitting or even requiring off-duty policemen to be armed.
The rapid deterioration between the parties to this tragedy was as momentary as it was momentous, and there was no point in the almost lightning-like series of events which culminated in DeNoux’s pistol shot where the City became, in any way, a stakeholder.
Police authority (and, thus, City responsibility) is not susceptible to retroactive designation and the situation here existent was never productive of the application of the doctrine of respondeat superior.
DeNoux and Reboul (accompanied by their friend, Schilling) did not commence the evening as agents or employees of the City in any liability-generating manner, nor did they — up to and including the moment that Cheatham was shot — change that status. They were, in every sense of the word, off-duty. As they proceeded along their way, situations could have come into existence or been discovered by them which might, quite properly, have provoked a change in their status. Had they, in such a situation, sought to keep the peace, the City would ordinarily be obliged to respond for their negligent acts, but, when their own independent actions not only provoke a disturbance but cause it to be concluded in the disastrous manner of this case, the City’s status quo cannot be gainsaid by such after-the-fact exercises as displaying a police identification card and “taking charge” at the scene. Were this to be the case, the City would become, essentially, the guarantor of all of the actions of all of its police officer employees at all times, for, then, any act, however bizarre, could be a basis for City liability by the expedient of subsequent identification as action within the course and scope of City employment. Thus, departmental regulations which encourage off-duty personnel to carry their credentials and their weapon cannot, standing alone, change off-duty status when, as noted in Normand v. City of New Orleans (No. 8410 on our docket, decided September 26, 1978, rehearing denied November 20, 1978), La.App., 363 So.2d 1220, the servant “engages in a frolic which is in no manner related to service of the master.” As further noted in that opinion, “The ultimate determination depends upon the particular facts and circumstances of each individual case.”
*153 Accordingly, we hold that the trial court was manifestly in error in concluding that DeNoux (and Reboul) was acting in the course and scope of his employment.
The judgment of the Civil District Court for the Parish of Orleans is amended as follows: ■
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Sheryl Cheatham, widow of Charles Cheatham, individually, and against Daniel DeNoux in the full sum of $170,000, together with legal interest thereon from the date of judicial demand until paid, and for all costs.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Sheryl Cheatham, widow of Charles Cheatham, on behalf of her minor son, Charles Cheatham, Jr. and against Daniel De-Noux in the full sum of $55,000, together with legal interest thereon from the date of judicial demand until paid, and for all costs.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the claim of Sheryl Cheatham, widow of Charles Cheatham, individually and in behalf of the minor, Charles Cheatham, Jr., against Stephen Reboul and the City of New Orleans is dismissed, at plaintiff’s cost.

REVERSED IN PART, AMENDED IN PART AND RENDERED.

SCHOTT, J., dissented in part and filed opinion and was of the opinion rehearing should be granted.

. The jury’s award of $50,000 for conscious pain and suffering, with no evidence whatsoever to support such a finding, is, itself, indicative of the desire of this jury to punish the culpable party rather than to compensate the victim’s heirs for losses proved in the record.