376 So.2d 1046 (1979)
Laura Jean STEWART, as Natural Tutrix of Clerice Yvett Wilson
v.
Don SCHMIEDER, d/b/a Schmieder Enterprises, et al.
Dorothy Franklin JEFFERSON
v.
Don SCHMIEDER, d/b/a Schmieder Enterprises, et al.
Roland DESHOTEL
v.
12055 AIRLINE CORPORATION et al.
Billie Jean McGOWAN, Individually and as Natural Tutrix of her Minor Child, Cheryl Sue McGowan
v.
Don SCHMIEDER, d/b/a Schmieder Enterprises, et al.
Stanley L. STEVENS
v.
12055 AIRLINE CORPORATION et al.
Nos. 12759-12763.
Court of Appeal of Louisiana, First Circuit.
October 8, 1979.
Rehearing Denied November 29, 1979.
*1047 Paul H. Due, Baton Rouge, for plaintiff-appellee, Laura Jean Stewart, etc.
Walter G. Monsour, Jr., Frank J. Gremillion, Baton Rouge, for defendant-appellant, City of Baton Rouge.
David W. Robinson, Baton Rouge, for defendants-appellees, Don H. Schmieder & 12055 Airline Corp. & John W. McLaughlin.
John A. Bivins, Lafayette, for defendants-appellees, The Rust Engineering Co. & American Mutual Liability Ins. Co.
Harris D. Copenhaver, Jr., Baton Rouge, for defendant-appellant, Roy C. Rackley, Jr.
William J. Doran, Jr., Baton Rouge, for defendant-appellee, Richard D. Schmieder.
Before ELLIS, CHIASSON and PONDER, JJ.
ELLIS, Judge:
These five consolidated cases arise out of the collapse of a building owned and being constructed by Don H. Schmieder. As a result thereof Jimmy Lee Wilson, Franklin *1048 Jefferson and William Holmes McGowan were killed, and Roland Deshotel and Stanly L. Stevens were injured.
Mr. Schmieder had agreed to construct an office building on his property, which was to be leased to Rust Engineering Company. He retained Roy C. Rackley, Jr., an architect, to draw the plans and specifications. Mr. Rackley, who was working at an hourly rate, prepared five pages of plans, at which point he was told to stop work by Mr. Schmieder. It is conceded by all parties that the plans were incomplete and totally inadequate for the construction of the building. However, on November 28, 1973, the plans were submitted to the Inspection Division of the Department of Public Works of the City of Baton Rouge and Parish of East Baton Rouge for the issuance of a building permit. At that time, Mr. Rackley certified that the plans were in conformity with the Baton Rouge Building Code, and that he would inspect the building to see that the construction was in compliance therewith.
On January 25, 1974, a "shell" permit was issued by the City-Parish, and construction was commenced. Mr. Rackley was never asked to complete the plans and specifications, and did no further work thereon. He was not asked to perform any supervision of the construction of the building by Mr. Schmieder, who testified that the only reason he retained Mr. Rackley was to satisfy Rust and to get the building permit. Mr. Rackley was paid a total of $405.00 for his services.
Sometime in June, 1974, Mr. Rackley visited the building site, and noted a number of discrepancies in the manner in which the building was being constructed. He wrote Mr. Schmieder, informing him of the discrepancies and sent a copy of the letter to the City-Parish.
Mr. Vincent E. First, manager of the Rust Engineering office in Baton Rouge, and some of the other personnel of that office, had been following the construction of the building. They became concerned about some of the structural details, and questioned Mr. Schmieder about them. When his answers proved vague and unsatisfactory, Mr. First arranged a meeting with Mr. Rackley at the building site. They walked through the building together, and Mr. First pointed out his areas of concern. As a result of that meeting, Mr. Rackley once again wrote to Mr. Schmieder on August 6, 1974, detailing these objections and requiring that certain corrective steps be taken. At this time, no part of the roof had been set in place.
Mr. First testified that when he saw no sign of corrective action being taken by Mr. Schmieder after August 6th, he arranged a meeting with Amos Black of the City-Parish, at which he again outlined his concerns. This meeting took place on September 10, 1974. Apparently, as a result of this meeting, a letter was written to Mr. Rackley by Robert C. Groht, the Building Official for the City-Parish, in which he stated that the building could not be occupied until the City Parish was advised in writing in what manner the August 6th recommendations had been complied with.
After writing his letters of June 4th and August 6th, Mr. Rackley did not make any inspections to see if his recommendations were being met, although he visited the job once between August 6th and September 25, 1974. On September 25th, he received a call from Mr. Schmieder who told him that the corrective work was all done and he needed Mr. Rackley to so certify so that the electricity could be turned on. Mr. Rackley went to the job and made an inspection, at which, he testified, he was unable to verify completely that his requirements had been met. Nevertheless, he wrote a letter to the City-Parish certifying that Mr. Schmieder had complied with the recommendations of August 6th, that the building was structurally sound, and that he recommended acceptance of it. Five days later, on September 30, 1974, the roof of the building collapsed, causing the deaths and injuries complained of in these suits.
From the expert testimony in the record, which is virtually unanimous, it is clear that the collapse was unrelated to the matters touched on in Mr. Rackley's letters of June *1049 4th and August 6, 1974, and to the areas of concern expressed by Mr. First. The collapse was due to the defective manner in which the roof was attached to the front wall of the building. This was one of the few spots in which Mr. Schmieder followed the plans which had been prepared by Mr. Rackley.
The original defendants in all of these suits were Don H. Schmieder, John W. McLaughlin, Richard D. Schmieder, 12055 Airline Corporation, Mr. Rackley, the City-Parish, Rust, and its insurer, American Mutual Liability Insurance Company. Don H. Schmieder, Mr. McLaughlin, and 12055 Airline Corporation settled with all plaintiffs and the suits were dismissed as to them. After the trial on the merits, all suits were dismissed as to Richard D. Schmieder, and no complaint is made as to this ruling.
During the course of the trial, the Stevens, Stewart and Deshotel cases were settled with Rust and American Mutual, and trial of those cases was completed contradictorily with Mr. Rackley and the City-Parish. The trial of the McGowan and Jefferson cases was completed against Mr. Rackley, the City-Parish, Rust and American Mutual.
Following completion of the trial on the merits, the trial judge found all three defendants liable to the appropriate plaintiffs, and rendered judgments accordingly. All three defendants have appealed, asserting their freedom from fault. All plaintiffs have answered the appeals, in various respects.
LIABILITY OF ROY C. RACKLEY, JR.
Mr. Rackley seeks to avoid liability on the basis that he did only what was required of him by Mr. Schmieder, and that his contractual arrangement with Mr. Schmieder did not permit him to complete his plans and specifications or make the calculations necessary in connection therewith. This assertion is, of course, true. However, Mr. Rackley certified that he would inspect the building, when he did not do so on a regular basis. He also certified the building to be structurally sound when he could not have known this to be true. Finally, the roof-wall connection which failed was built in accordance with his design. These professional derelictions constitute negligence sufficient to render him liable to the plaintiffs in these cases. The judgments will therefore be affirmed insofar as Mr. Rackley is found liable.
LIABILITY OF THE CITY-PARISH
The duties and obligations of the City-Parish are outlined in the Baton Rouge Building Code. Section 5(b) sets forth the powers and duties of the Building Official:
"The Building Official shall have the power and duty to enforce all of the provisions of this Title; shall have general supervisory authority over the Administration and enforcement of all building codes and ordinances; and shall coordinate the administration and enforcement of all such ordinances to insure that all provisions thereof are fully complied with before the issuance of necessary certificates of occupancy; all permits shall be issued by him and he shall collect all fees provided herein, and transmit the same to the Director of Finance. He shall examine premises for which permits have been issued, and shall make necessary inspections to see that the provisions of law are complied with and that construction is prosecuted safety. He shall, when requested by proper authority, or when the public interest requires, make investigations in connection with matters referred to in the Building Code, and render written reports on the same. He shall issue such notices and orders as may be necessary to enforce compliance with the provisions of the Building Code, to remove illegal or unsafe conditions, to secure the necessary safeguards during construction, and to require adequate exit facilities in buildings and structures."
Section 102.6 of the Code provides, in part, as follows:
"Application for permits shall be accompanied by drawings of the proposed work, drawn to scale, showing foundation plans, floor and roof plans, elevations, sections and structural details sufficient to define *1050 completely the proposed construction. All plans shall be accompanied by duplicate plot plans, elevations, sections and structural details sufficient to define completely the proposed construction. All plans shall be accompanied by duplicate plot plans on letter-size sheets showing all lot dimensions and the location of the structure upon the lot or property with reference to each lot line. For all buildings or structures except as otherwise provided by this Section, the application for a building permit shall be accompanied by a complete set of plans and specifications prepared by an Architect or Civil Engineer licensed in accordance with Louisiana law, or under his supervision, and a certificate signed by the licensed Architect or Civil Engineer to the effect that the said plans and specifications comply with and are in conformity with the requirements of this Code, the State Fire Code and the State Sanitary Code and that said plans and specifications were prepared by him or under his supervision; and, all applications shall also be accompanied by a load and stress sheet showing the weights carried by the supports, including columns, posts, girders, lintels, pillars, foundations and footings, when the building is fully loaded, and the safe loads such supports, etc., will carry and stress sheet showing the stresses caused by the required wind load and the manner in which they are transmitted into the ground. The application for a permit for any new building or structure shall be accompanied by a complete description of the kind and size of such buildings, the character of materials to be used, the ground area to be covered, and the net cubic contents of such building. Before a Certificate of Occupancy is issued, the Architect or Civil Engineer must furnish the Building Official a certificate certifying that the building or structure has been completed, to the best of his knowledge, in accordance with the plans and specifications as approved by the Inspection Division and the maximum live load each floor will safely carry.
Section 102.11 provides:
"Nothing in this code shall be construed to prevent the building official from issuing a permit for the construction of part of a building or structure before the entire plans and detailed statements of said building or structure have been submitted or approved, provided adequate information and detailed statements have been submitted for the same and have been found to comply with this code."
It is clear from the foregoing provisions that the building permit in this case was issued in violation of the Code. It is not pretended that "adequate information and detailed statements" which complied with the requirements of the Code were submitted. That the Building Official was fully aware of this fact is evidenced by his letter of December 5, 1973, in which, inter alia, he required that Mr. Rackley "submit complete plans for proper review." Finally, the plans were not sufficient to prove the structural integrity of the shell of the building.
When Mr. Rackley's letters, which pointed out structural deviations from proper construction standards, were received, the City-Parish took no action other than to write a letter warning that an occupancy permit would not be issued unless the defects noted in the letters were remedied. Proper documentation of the structural integrity of the building was never demanded or received, up until the day the building collapsed.
The City-Parish argues that its duties in connection with building permits and inspection of construction are general in nature, owed to the public, and that there is no duty owed to the individual plaintiffs in these cases. Numerous authorities from other states and from this state are cited in support of that proposition. We find those authorities to be inapplicable under the special circumstances of this case.
In this case, by a flagrant disregard of its own rules, the City-Parish issued a building permit which should not have been issued. It never required that the calculations and specifications required by the Code be submitted. *1051 Its inspections of the structural progress of the building were sporadic and, apparently cursory, since they failed to disclose such obvious deviations from the plans as the substitution of concrete beams for steel beams supporting the second floor. When serious questions were raised relative to the structural integrity of the building, it took no effective action to require that the architect and contractor comply with the requirements of the Code, and document, with full plans, calculations and specifications, the propriety of the practices being followed in the construction of the building.
We find that such gross deviations from its own rules and regulations constitute negligence sufficient to render it liable to those damaged by the collapse of the building.
LIABILITY OF RUST ENGINEERING
By lease agreement dated November 30, 1973, Rust agreed to lease from Baton Rouge Wood Products, Inc., a corporation owned by Don H. Schmieder, certain property and a building to be erected thereon, "in accordance with Lessee's performance specifications dated November 29, 1973, and Drawings No. A-1 entitled, `Floor Plan', and No. S-1, entitled, `Site Plant', both dated November 29, 1973."
The performance specifications contained the following provisions:
"Drawings of the site development and building `shell', which shall include foundation, underfloor utilities, framing, exterior walls and roof, shall be submitted by December 3, 1973, to Rust for approval. Approved drawings shall be returned by December 7, 1973.
"The remainder of all drawings required for the completion of the building shall be submitted by December 17, 1973, to Rust for approval. Approved drawing shall be returned by December 28, 1973."
The drawings made by Mr. Rackley were, in fact, attached to the lease agreement and were initialled as approved by John M. Clark, a vice president of Rust Engineering. It was the testimony of Vincent E. First that this approval by Rust was only as to the floor plan, which had been specified by Rust in the attachments to the lease agreement.
The record shows that Rust Engineering designs and builds large industrial plants, and has in its employ various kinds of engineers, including structural engineers. It was as a result of observations by some of these engineers, as well as by himself, that Mr. First raised the various objections which are detailed above. It is not contended that Rust ever attempted to withdraw from the lease agreement because of the alleged deficiencies complained of by it, nor in any way to stop or influence the construction.
The trial judge concluded that, since Rust had the right to approve the plans, it also had a duty to ascertain that the building to be constructed therefrom was safe, and that this duty was owed not only to its employees and future business invitees, but to workmen on the site during construction. He found that, in approving inadequate and incomplete plans, in failing to require submission of structural calculations for review, and in failing to withdraw its approval of the plans "when alerted to the danger by actual observation", it breached the above duty, and was therefore liable to the plaintiffs.
We cannot agree that the reservation of the right of approval of a set of plans carries with it the obligation of determining that the building constructed therefrom is safe and adequate in every respect. We think that approval of plans relates only to such matters as floor plan, lighting, appearance, and other matters concerning the utility of the building and the purpose for which it is intended. That was the interpretation put on the contract in this case by the parties thereto, as indicated by their testimony and by their actions prior to the collapse.
Neither do we agree that the concern felt by Rust personnel about certain aspects of the construction of the building places on Rust any duty towards the plaintiffs in this case. The objections made by Mr. First were, in fact, met by Mr. Schmieder and *1052 certified by Mr. Rackley, and, in any event, were totally unrelated to the cause of the collapse of the building.
We therefore find that the judgment must be reversed insofar as it finds Rust Engineering to be a joint tort feasor with Mr. Rackley and the City-Parish, and liable to the plaintiffs in damages.

DAMAGES
In the Jefferson case, plaintiff has answered the appeal, asking that the award for loss of future support be increased. The trial judge made the following award:
"At the time of his death, Mr. Jefferson had a work life expectancy of 22.3 years and a life expectancy of thirty-one to thirty-five years. His gross earnings from employment using only the above figures would have been approximately $162,230.00.
"This Court has considered the same factors previously explained in the case of Mr. McGowan's earnings; namely, that the figure contains no amounts for increases which have become common by virtue of inflation but likewise contains no other deductions such as income tax, social security, union dues and the like. It is also contemplated that this award will be paid in a lump sum which would allow at least a portion to be invested and earn interest income.
"Based on the above, an award of $80,000.00 will be made to Mrs. Jefferson for loss of future support and an award of $50,000.00 for loss of love, affection and companionship will be made."
Plaintiff Jefferson complains that the trial judge failed to consider the testimony of her expert economist, and failed to consider the proper factors in making his award. She cites the recent case of Blanchard v. Rodrigue, 340 So.2d 1001 (La.App. 1st Cir. 1976), in which the court said:
"The settled jurisprudence of this state is that damages for loss of support are speculative in nature and cannot be calculated with mathematical certainty. The most a Court can do in such cases is to exercise sound judicial discretion and award an amount which, considering all the circumstances, seems just to both parties and is not unduly oppressive to either. Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968); McFarland v. Illinois Central Railroad Company, 241 La. 15, 127 So.2d 183 (1961).
"Factors which should be weighed in determining the amount due for loss of support include the decedent's present earnings, his age and life expectancy, his work-life expectancy, the possibility of a decrease or increase in his earnings, the decedent's job security, the nature of decedent's work, his health, his relationship with his family, his personal expenses and his past work record. Other factors are the surviving spouse's age and health, the minor children's age, and the effects of inflation and the need to discount future earnings to a present day amount. In short, all factors relevant to a determination of the amount of the loss of support due to the premature demise of the decedent should be considered."
At his death, Mr. Jefferson was earning $7,275.00 per year, and had a work life expectancy of 22.3 years. He was 41 years of age. To the gross earning figure of $162,232.50, the economist applied an age-earnings factor, a cohort survival factor and a 5.8% annual increase in earnings factor. He then discounted the total at 5%, 6% and 7% to reach three alternate present day values, depending on the discount rate used. These were reduced by a 25% personal maintenance factor. At a 6% discount rate, a figure of $121,429.00 was reached.
Our review of the jurisprudence reveals that various courts have accepted various factors in trying to arrive at fair compensation for loss of future earnings or support. This court has held that possible tax liability or consequences will not be considered in fixing such awards. Reeves v. Louisiana and Arkansas Railway Co., 304 So.2d 370 (La.App. 1st Cir. 1974). Other courts have held that a widow or child can not recover more than they might reasonably expect to receive if the decedent had lived, and that they could not expect to recover his before *1053 tax wages, since they would not have shared them had he lived. Cheatham v. City of New Orleans, 368 So.2d 146 (La. App. 4th Cir. 1979), writ granted 371 So.2d 618 (La.1979). Personal maintenance factors of as high as 50% have been applied in cases in which only a widow survives the decedent. It is, of course, basic that expert economic testimony is only a guide to the court in fixing awards, and is not binding on the judge, even though uncontradicted. It is also basic that trial judges have a great range of discretion in fixing damages and that their awards should not be disturbed unless that discretion has been abused.
Considering all of the foregoing, we find that, whatever approach was used in fixing the award complained of, it is, although low, within the bounds of the discretion accorded the trial judge.
In the McGowan case, much the same argument is made. Mr. McGowan was 37 years old when he was killed, and earned $11,900.00 per annum. He had a work life expectancy of 25.8 years. The trial judge found his gross earning potential to be $307,000.00, and said:
"This computation makes no allowance for future increases. Based on past history, such increases are more likely than not. It does not, however, make any allowances for certain other deductions such as income taxes, social security payments and other deductions which are made in the case of all workers. Additionally, the Court must contemplate that the award will be received in a lump sum with a substantial portion thereof being available for investment with resultant interest income.
"Based on a consideration of all of the facts and circumstances cited above, an award to Mrs. McGowan for the loss of future support in the amount of $160,000.00 should be made, and an additional amount for loss of love, affection and companionship in the amount of $50,000.00 should be made."
An award of $17,500.00 for loss of future support was made to Cheryl Sue McGowan, his daughter, who was 16 years old at the time of his death. The judge assumed that the support would have continued through college, or for a period of seven years.
Plaintiffs' expert economist testified to expected future earnings of $258,285.00 at a discount rate of 6%, as reduced by a personal maintenance factor varying from 18 to 25 per cent.
Once again, we find the gross award made by the judge for loss of support of $177,500.00 to be within the broad range of discretion afforded him in such cases.
In the Stevens case, the trial judge awarded $200,000.00 for loss of earnings, and $125,000.00 for past, present and future pain and mental anguish and future medical expense. Mr. Stevens suffered painful and extensive leg injuries, resulting in a 15% loss of use of his left leg, 65% loss of use of his right leg, and a permanent disability to engage in his trade as a carpenter. At the time of the accident, Mr. Stevens was 45 years of age, had a work life expectancy of 18.9 years, and was earning $13,246.00 per year.
Plaintiff claims the award to be low in that it fails to include any award for the permanent disability, and is lower than the award made in the case of Lanclos v. Hartford Acc. & Indem. Co., 366 So.2d 621 (La. App. 3rd Cir. 1978). In that case, the Third Circuit permitted to stand a very large jury award to a woman with injuries similar to those of Mr. Stevens. The court quoted at length from the recent Supreme Court case of Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), relative to the standards of review to be applied in quantum cases. In obedience to the same standards of review, we find no abuse of the great discretion accorded the trial judge in the somewhat low award made in this case for pain, suffering and disability.
In all of the cases, the City-Parish was taxed "only for such elements of court costs as may be legally assessable . . ." By answer to the appeal, all plaintiffs have asked that they be taxed for costs in full. They cite Segura v. Louisiana Architects *1054 Selection Bd., 362 So.2d 498 (La.1978), which holds that, under the Constitution of 1974, Article 12, Section 10, court costs are part of the liability of the State and its subdivisions, since they are no longer immune from suit.
We see no reason to amend the judgments in that respect, however, since the City-Parish is cast for all costs for which it may be legally assessable, and, under the Segura case, they are legally assessable for all costs.
For the foregoing reasons, the judgment in the Stewart case, No. 12759, is affirmed, at the cost of appellants Rackley and the City-Parish.
AFFIRMED.