379 So.2d 255 (1979)
Kenneth D. CARDWELL, and Clifton Cowans
v.
JEFFERSON RENTALS DIVISION OF J-R EQUIPMENT CORPORATION ASSURANCE COMPANY.
No. 10121.
Court of Appeal of Louisiana, Fourth Circuit.
May 4, 1979.
Order on Rehearing September 5, 1979.
On Rehearing November 8, 1979.
Breard Snellings and Jack M. Alltmont, Sessions, Fishman, Rosenson, Snellings & Boisfontaine, New Orleans, for defendants-appellants.
Edward L. Levert, Jr., Young, McMahon & Levert, New Orleans, for intervenors-appellees (Sentry Insurance).
*256 August J. Bubert, Ardoyno & Bubert, Metairie, for plaintiffs-appellees.
Before GULOTTA, BOUTALL and SCHOTT, JJ.
SCHOTT, Judge.
On May 16, 1975, plaintiffs were employed by Crawford Hollywood Door Sales (Hollywood) to hang and install doors. In connection with an installation at the Federal Building of an overhead door they were in the process of lifting an 800 pound drum to the top of a door frame using a one-ton chainfall hoist when the hoist broke, causing the drum to fall and strike plaintiff Cardwell and causing injury to plaintiff Cowans as he jumped back in order to avoid the falling drum and fell over some pallets in the process.
On the day before the accident plaintiff's supervisor had rented the hoist from defendant Jefferson Rentals Division of J-R Equipment Corporation (Jefferson). When he picked up the hoist he put it in his truck, kept it in the truck overnight at his home and delivered it to the job site on the next morning. Upon inspection of the hoist after the accident it was found that the shaft had broken at the end where a cotter pin goes through it.
The trial judge decided the question of liability against Jefferson and its insurer on the basis of strict liability under LSA-C.C. Art. 2317 as interpreted and applied in Loescher v. Parr, 324 So.2d 441 (La.1975). In his reasons for judgment, the trial judge found that the defect in the hoist was such that it was not discoverable upon a reasonable inspection by Jefferson and the failure was not caused or contributed to by any abuse or misuse of the hoist on the part of plaintiffs or any of the employees of Hollywood. Thus, the first error specified by defendants on appeal is the imposition upon them of strict liability.
Defendants rely on Lyons v. Jahncke Service, Inc., 125 So.2d 619 (La.App. 1st Cir. 1960) in which the court held that a compensated bailor of potentially dangerous movables is responsible to third persons for defects existing at the time of the delivery to bailee of which he had actual knowledge or could have discovered upon the exercise of reasonable care. The court held:
"Such a bailor is not responsible to third persons for defects arising during the bailment period subsequent to delivery to bailee nor is he responsible to third parties for hidden or latent defects existing at the moment of delivery and discoverable only upon minute or extraordinary inspection or examination."
We have no hesitancy in concluding that the approach to the liability of the bailor as expressed by the court in the Lyons case must be re-examined in the light of the jurisprudential development of the doctrine of strict liability which began with Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971) and culminated with Loescher v. Parr. In the process of this development the court made a drastic change in the interpretation of Arts. 2315 through 2324 of the Louisiana Civil Code on liability for offenses and quasi-offenses extending strict liability to the owner of an animal under Art. 2321 in Holland v. Buckley, 305 So.2d 113 (La.1974) and to the parents of small children under Art. 2318 in Turner v. Bucher, 308 So.2d 270 (La.1975). In the Loescher case, the court specifically dealt with Art. 2317 which provides as follows:
"We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody. This, however, is to be understood with the following modifications."
After discussing the cited jurisprudence and the historical basis for the cited articles of the Civil Code, the court concluded:
"... It is logically consistent and in accord with the scheme of delictual responsibility represented by [its] companion code articles to hold that, similarly, Article 2317 embodies the concept of the legal fault of the guardian of a thing for the damage caused by the defect of his thing."
*257 The argument in the instant case narrows down to the point that when the chain hoist broke it was no longer in the "custody" of Jefferson but was rather in the custody of Jefferson's lessee or bailee Hollywood, so that Art. 2317 and the Loescher case provided no basis for liability to plaintiffs on the part of Jefferson. In resolving this problem the trial court relied on the language of footnote 6 in the Loescher case at 324 So.2d 447. In the body of the opinion the court said the word "custody" used in Art. 2317 is a translation of the word "garde" in the French Code, and in the footnote said:
"At this point, however, we should note that the English translation of `sous sa garde' as `in our custody' does not fully express the concept of the `garde' of a thingthe legal responsibility for its care of keeping, so that one may lose the custody of a thing without losing its `garde'."
Notwithstanding the language of this footnote, the extension of Art. 2317's liability to Jefferson in this case surely involves an extension of the holding in Loescher v. Parr because the court there found that the tree which caused the damage was in the custody of the defendant owner of the tree, whereas in the instant case physical custody of the hoist had been transferred from Jefferson to Hollywood when the accident occurred. Nonetheless we have concluded that this extension of the Loescher case is warranted under the facts and circumstances of the instant case and by virtue of the court's seeming approval of the discussion and the specific quotation given in footnote 7 of the Loescher opinion at 324 So.2d 449 from Verlander, We Are Responsible, Tulane Civil Law Forum No. 2 (1974):
"[T]he things in one's care are those things to which one bears such a relationship as to have the right of direction and control over them, and to draw some kind of benefit from them. This relationship will ordinarily be associated with ownership, but the guardianship will also belong to the bailee, the lessee, the usufructuary, the borrower for use and the repairmen, among others.... The owner may transfer the guardianship by transferring the thing to another who will bear such a relationship to the thing as to himself have the care of it. He may also lose the care of this thing, principally by the theft of the thing."
The chain hoist in this case broke almost immediately after Hollywood's employee took delivery of it from Jefferson. The fact that it was held overnight before being put to actual use is of no moment since its failure occurred almost from the first moment it was being used by plaintiffs. As we read the quotation from the Verlander article, his problem was to find a basis for extending the liability of the owner to the bailee, lessee, etc., but liability seemed to remain in the owner except in that case where he lost the care of the thing "principally by the theft of the thing." The artificial transfer of custody in this case from Jefferson to Hollywood without the intervention of any act of maintenance or indeed without the intervention of any use of the thing whatsoever by Hollywood before it broke did not remove the chain hoist from the custody of Jefferson in such a way as to relieve Jefferson of its liability under Art. 2317. Having concluded that the judgment appealed from is correct with respect to liability, we turn now to the question of the quantum of the awards.
Cowans was awarded $7500 for a lumbosacral strain while Cardwell was awarded $90,000 for general damages and $153,110.11 for loss of wages past and future. The award for pain and suffering was explained by the trial judge to include $9,000 for a lumbosacral and cervical sprain, and the balance of the $90,000 for his knee injury.
Following the May 16 accident both Cowans and Cardwell were referred by their attorney to Dr. Sam Charles Macaluso. He saw them both on May 20, and who gave the following testimony: Cowans was complaining of pain and stiffness in the back and following a physical examination Dr. Macaluso found tenderness, spasm and restriction of movements in the back area. *258 He prescribed muscle relaxants and diathermy treatments. He last saw Cowans on November 14, 1975, and found that he was improving but he still had tenderness, spasm and restriction of movements. He never discharged Cowans. His diagnosis was a lumbosacral sprain. As to Cardwell, he was complaining of pain to the right knee and back, and on examination Macaluso found tenderness, spasm and restriction of movements over the cervical as well as the lower back area. There was also tenderness and restriction of the right knee, and he diagnosed cervical sprain, lumbosacral sprain and contusion of the right knee. He prescribed muscle relaxants and diathermy treatments, and he continued to treat Cardwell until November 14, 1975, when he felt that Cardwell had improved with respect to his neck and back although his knee might require further treatment. Macaluso's records showed that Cowans and Cardwell were both seen by him on nine identical dates between May 20 and September 30. Cowans was seen on October 4 while Cardwell was seen on October 20, and they were both seen for the last time on November 14. Cowans received 38 diathermy treatments between May and October, while Cardwell received 36 diathermy treatments between May and October, and these treatments were on the same days and were identical except for the first two, which Cowans received and which Cardwell did not receive.
Other significant evidence consisted of Cowans' testimony that he missed only a day and a half of work even though he insisted that his back was hurting him throughout this period of time, while Cardwell missed only eight days of work in the two weeks following the accident and then worked in excess of 40 hours a week for the rest of the year (except for one week in August when he worked 34 hours and one week in October when he worked 34 hours) until he quit his job in the last week of December.
We have concluded that these $7500 and $9,000 awards for supposed soft tissue injuries constitute an abuse of the trial court's discretion. Had Cowans and Cardwell produced no medical witness whatsoever we would readily conclude that the judgments of $7500 and $9,000 were excessive. Dr. Macaluso's testimony lends no support to their case. This is the same Dr. Macaluso who treated the plaintiffs in Sanders v. Hall and whose testimony was the sole support for awards of $2,000 in general damages to four plaintiffs who had identical 15-week courses of diathermy treatments. In our initial opinion, at 345 So.2d 590, we felt we took the view that we were mandated by Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976) to affirm but the Supreme Court granted writs and remanded the case to us. We then reduced these awards to $300 each at 350 So.2d 262, and the Supreme Court subsequently refused writs at 352 So.2d 703 (La.1977). We conclude that Dr. Macaluso's testimony is entitled to little weight in providing any objective medical support for plaintiffs' soft tissue injuries. People are not trained seals when it comes to experiencing pain and having a need for the relief which can be afforded by proper medical treatment. They do not pop up on the same day, requiring initial treatment by a physician four days after the accident occurred. Their pain and discomfort do not occur in such unison that they require 36 diathermy treatments on the same dates over a six month period and then stop hurting simultaneously on a date six months after the accident to the extent that they no longer require treatment. Such a record would compel incredulity even by the most gullible. We have concluded that awards of $500 to Cowans and $750 to Cardwell for their soft tissue injuries are appropriate awards.
We turn next to the knee injury sustained by Cardwell for which he was awarded $81,000 in general damages and which was the basis of the award for loss of wages.
Cardwell was seen by Dr. Russell Levy, an orthopedist, for his knee on January 1, 1976. At the outset Dr. Levy discovered that Cardwell had sustained an injury to the same knee seven years previously in a *259 motorcycle accident and the knee had required surgery. This earlier knee condition consisted of a rupture of the right medial collateral ligament and a tear of the interior cruciate ligament. After some conservative treatment of the knee Dr. Levy performed surgery on Cardwell's knee and his diagnosis of a torn lateral meniscus of that knee was confirmed. The entire cartilage was removed on the outside at this time and early changes of degenerative arthritis were noted but did not warrant an operation on the knee cap itself. By June 21, 1976, Cardwell's knee had improved and he had a full range of motion in the knee and Dr. Levy felt that Cardwell could return to work with a limitation on the amount of climbing he could do. Dr. Levy continued to see plaintiff and by February, 1977, because of recurring synovitis or swelling of the knee Dr. Levy felt that he should not climb on ladders and should avoid standing over long periods of time. He assigned an overall disability rating to Cardwell of 10% disability with 5% of that attributed to the first accident and surgery and the remaining 5% attributed to the present accident and surgery.
At the time of the accident, plaintiff was earning $5.15 an hour and his work was heavy and laborious consisting of regular climbing on ladders and handling heavy doors and component parts. Cardwell is virtually illiterate, being unable to read or write, and his ability to find a job was and is limited primarily by this handicap. The trial judge arrived at his judgment of $153,000 for wages based on the testimony of an economist who computed his loss of past earnings as the difference between what he should have made and what he actually did make doing various jobs as a watchman and in other areas between the date of the accident and time of the trial. Future earnings were based on a work life expectancy of 21.6 years and a sum discounted on the basis of 5.7/8. He calculated Cardwell's earnings by figuring eleven months' salary in 1975, and arriving at a monthly factor on that basis. After adding to these figures a 3% increase for inflation he deducted an amount which Cardwell could earn based on the minimum wage. We are unable to accept these figures.
In the first place, the figures themselves which the economist used are erroneous in that Cardwell's 1975 work record was not a sum earned over 11 months but rather that same sum earned over the full year less eleven days which he lost. This would have the effect of decreasing the monthly factor which provided the basis for the economist's figures.
The record of this case, as far as Cardwell's knee is concerned, reads more like a workmen's compensation case than a tort case. It establishes that Cardwell can no longer perform the job of a door hanger but there is no evidence that he cannot be rehabilitated so as to perform work which would pay him more than the minimum wage and perhaps as much as he was getting from Hollywood. He produced a vocational rehabilitation counselor who specifically declined to gainsay any opinion as to Cardwell's ability to work but confined her testimony to the fact that Cardwell had gone around looking for other jobs and had not taken any. There is evidence that he has done tack welding in the past. Cardwell's principal problem is not his knee, as far as employment is concerned, but rather his illiteracy. He is not even able to handle the job of a watchman properly because he is unable to make reports. Nothing in this record indicates that he can't be taught to read and to write and thereby have a greater potential in the job market. The trial judge basically concluded that Cardwell is totally and permanently disabled as in a workmen's compensation case, although Jefferson was credited for minimum wages which Cardwell might earn.
However, the most important weakness in Cardwell's case is in the fact that this case was consolidated with Cardwell's workmen's compensation claim against Hollywood in which shortly before the trial of the instant case the trial judge approved a compensation settlement for Cardwell in the amount of $3,282.
*260 If his claim in workmen's compensation was worth so little considering that workmen's compensation legislation is social and is to be interpreted liberally in favor of the employee who is hurt on the job, and considering that his claim for workmen's compensation could not be compromised without judicial approval we are constrained to hold that the award to Cardwell for lost wages has no rational or legal basis and constituted an abuse of discretion on the part of the trial court.
A similar approach was taken by the court in Burke v. Commercial Standard Ins. Co., 38 So.2d 644 (La.App. 2nd Cir. 1948):
"Such a settlement ill accords with the strenuous assertion of plaintiff in this suit as to the serious nature and results of his alleged injury, and it is most difficult for us to reconcile plaintiff's willingness to accept a pittance of some $600.00 in settlement of a claim which, if his contentions be accepted in the present case, comprehended total disability. Surely a proceeding under the liberal provisions of our compensation statutes which, if successful, would have resulted in judgment in favor of plaintiff for compensation at the rate of $20.00 per week for not more than 400 weeks, was a consideration not lightly to be set aside in a weighing of values, as opposed to the obvious chances and uncertain results of litigation under a tort proceeding."
Finally, the general damage award of $81,000 for Cardwell's knee was grossly excessive and was also an abuse of discretion. Except for some slight limitations in climbing and standing over long periods Dr. Levy found no residual from Cardwell's knee injury and did not expect any. Much of the residual was undoubtedly left over from the injury Cardwell had seven years previous to the same knee. It is significant that Cardwell worked almost without interruption after the accident in May until the end of the year, quitting shortly before the case was first assigned for trial. This serves to support the conclusion that Cardwell was not in great pain but rather was suffering some discomfort at the most.
We have concluded that the most this record supports for loss of wages for Cardwell is $10,000, and the most it supports for general damages for the knee is $25,000.
Accordingly, the judgments appealed from will be amended to reduce the award to Clifton Cowans to the sum of $500, and the judgment in favor of Kenneth D. Cardwell will be reduced to $35,750. Costs of this appeal are taxed against plaintiffs.
AMENDED AND AFFIRMED.

ORDER GRANTING REHEARING
This case is before us on an application for rehearing by Kenneth D. Cardwell and Clifton Cowans, plaintiffs-appellees.
IT IS ORDERED that a rehearing be granted. The case will be submitted on rehearing on October 9, 1979, on present record and on additional briefs to be filed by defendants-appellants on or before September 21, 1979, and by plaintiffs-appellees on or before October 5, 1979. These additional briefs should examine our original opinion dated May 4, 1979, in the light of the Supreme Court decisions in Folse v. Fakouri, 371 So.2d 1120 (La.1979) and Reck v. Stevens, 373 So.2d 498 (La.1979).

ON REHEARING
We granted a rehearing limited to a reconsideration of our reduction of the trial court's awards. We took this action considering two recent opinions of the Supreme Court, Reck v. Stevens, 373 So.2d 498 (La. 1979) concerning a reduction of an award for general damages, and Folse v. Fakouri, 371 So.2d 1120 (La.1979) concerning a reduction of an award for loss of wages and earning capacity. The Reck case concerns the awards to both of the plaintiffs while the Folse case concerns the award to Cardwell only.
In the Reck case the court stated: "It is only after articulated analysis of the facts discloses an abuse of discretion, that the award may on appellate review, for articulated reason be [modified]." Then the court should resort to prior awards in order to determine the appropriate award in the case.
*261 The articulation requirement creates some difficulty. When the Court of Appeal concludes that an award constitutes an abuse of the much discretion of the trier of fact that conclusion is normally supported by an opinion which covers the highlights of the case and provides the principal reasons for the conclusion. In the process briefs are read, oral arguments are heard, the transcript of testimony is read, exhibits are examined, legal authorities are consulted and conferences are held by the panel. Judges naturally apply to the case lessons from their own experiences and subjective philosophies and a process of reasoning to reach a conclusion which, hopefully, is rationally sound and just and fair to the litigants. A true articulation of this process in every case where an award is believed to be so high or so low as to constitute an abuse of the trial court's discretion is an impossibility. Furthermore, the extent of articulation required in a case depends upon how obvious is the excess or inadequacy of the award in question.
Our original opinion in this case may satisfy Reck's articulation requirements, but in the process of considering the case on rehearing we have noted some factors which were not previously mentioned and are significant.
Regarding the awards to Cowan and Cardwell for the soft tissue injuries for which they were treated by Dr. Macaluso and for which Cowan was awarded $7500 for general damages and Cardwell $9000, we are satisfied that our original opinion sufficiently articulated the reasons why we concluded that the awards constituted a gross abuse of the trial court's discretion. That the trial court did not have the benefit of the Supreme Court's ultimate disposition of Sanders v. Hall, 352 So.2d 703 (La.1977) and the corresponding sound rejection of Dr. Macaluso's testimony tends to explain the excessiveness of the awards. The very same considerations which led us to reduce the awards in the Sanders case (350 So.2d 262 and 345 So.2d 590) have compelled us to reduce plaintiffs' awards in this case.
In reaching this conclusion we are well aware that the trial judge was highly impressed with the plaintiffs but his judgment's underpinnings were all of the visits to and diathermy treatments at Dr. Macaluso's office, all done in almost perfect unison by the plaintiffs. With Dr. Macaluso discredited there is simply no basis for the judgment.
Having articulated our reasons for concluding that these awards constitute an abuse of the trial court's discretion we need turn only to Sanders v. Hall to determine the proper range of plaintiffs' awards. The Sanders plaintiffs got $300 each for their highly suspect claims. Cowans gets $500 and Cardwell $750 (for the soft tissue injury only).
We next consider Cardwell's knee injury for which he was awarded $81,000. Without repeating everything contained in our original opinion some clarification and amplification are in order. Immediately after the accident on May 15, 1975, Cardwell was treated by his employer's physician. He first saw Dr. Macaluso on May 20 and had some moderate tenderness and restriction of the right knee at that time. During the ensuing six months of visits and diathermy with Cowans, Cardwell did have some heat applications to his knee and was instructed to wear a knee support. But the knee was not of great concern to Dr. Macaluso and it was not seriously treated until January 1, 1976, when Cardwell saw Dr. Russell Levy, an orthopedic surgeon. Except for the first twelve days after the accident Cardwell had continued in his job without interruption until the last week of December earning $2546 in the last quarter of 1975, $2509 in the third quarter, $2434 in the second quarter (when the accident occurred) and only $2367 in the first quarter.
When he first examined Cardwell Dr. Levy found a scar from previous knee surgery, some atrophy, instability and tenderness. On January 19 Cardwell returned complaining of increased discomfort and locking of his knee. Dr. Levy suspected a torn cartilage and considered an arthrogram which he delayed until he could review *262 the history of Cardwell's previous surgery. Over the next three months Dr. Levy administered conservative treatment but there was an increase of atrophy, Cardwell complained of more pain and locking of the knee and swelling developed from fluid or thickening of the joint's lining. Finally, an arthrogram was performed and indicated that the lateral cartilage was torn. In the meantime the report from Dr. Rozas who had treated Cardwell for his knee injury in 1969 revealed that the medial cartilage had been repaired in surgery and Cardwell was left with a chronic synoritis or swelling from that accident. On April 27 Cardwell was admitted to the hospital for surgery on the lateral cartilage. In the course of the operation Dr. Levy observed degenerative changes on the medial cartilage consistent with Cardwell's age and removed the lateral cartilage. After normal post-operative treatment and therapy, by June 21 Cardwell had a full range of motion in the knee and was discharged as able to return to work except for climbing. He never returned to Dr. Levy for further treatment.
The work record shows that Cardwell worked full time in March and April, 1976, worked in July when he quit, and returned to work in September. He worked full time from the second week of September until the end of December, 1976, when he quit again. At that time the case was scheduled for trial in January, 1977.
In his reasons for judgment the trial court stated:
"... Thus the Court concludes that for the benefit of the defendant and its appeal if there be one, it puts into the record that it is convinced that Cardwell's present problems are as a result of the instant accident. He had gotten over the effects of the 1969 motorcycle accident...."
This finding is manifestly erroneous and clearly wrong. Although it is supported somewhat by Cardwell's testimony, it is flatly contradicted by his own physician, Dr. Levy, whose credibility he vouched for when he called him as his witness. Dr. Levy testified on cross-examination as follows:
"Q And as a result of the both of the accidents, you gave him a ten percent disability of the right leg, did you not?
A Yes.
Q And you did not break down however how much was due of this ten percent was due to the first accident in 1969 and to my accident, you said it was both, but you did not say a percentage, I am wondering if you would give a percentage if possible.
A A removal of the cartilage in a knee usually gives five percent of the lower extremity, it is more or less standard between four to six or seven and five is what I usually rate these knees as unless they have a great deal of gross instability which will kick this up, it will depend upon the individual knee, but for a simple mynosectomy five percent is more or less a standard impairment. We merely say what the impairment would be. Where findings as time goes on, in a long run there's probably more than that, they seem to get degenerative changes in the knee faster than if they have the cartilage within the knee. As they grow older they seem to have a little acceleration in it.
Q But then, would it be fair to say that as a result of my accident, this gentleman has a five percent disability of the right leg?
A As a result of the accident I would say if all I did was a simply mynosectomy I would have to give him five percent impairment usually for a simple mynosectomy he can have some mild degenerative change at the same time.
Q The other one was the five percent also, making the ten percent?
A It depends upon the medial collateral ligament and how severe the injury is. This was evidently not torn all the way.
*263 Q He doesn't have that much instability in the leg today?
A No.
Q So, in conclusion, I wouldn't belabor that my accident gave him a five percent disability of the right leg and you don't want him to climb, right?
A Yes.
Q Now, you said he could go back to work on June 21, 1976, following your operation on January 12, right? January 12 was the operation?
A Yes.
Summing up, Cardwell suffered a torn cartilage of the knee which was already injured in a previous accident. After routine treatment and surgery over a six month period he was certified by his own physician to be fit for work except for climbing and standing for eight hours. $81,000 for such an injury is a clear abuse of discretion and is subject to reduction especially since the trial judge clearly erred when he concluded that all of Cardwell's disability was caused by the accident sued on.
An examination of the jurisprudence on rewards for similar injuries indicates that $25,000 would be appropriate. Bordelon v. Sentry Insurance Company, 359 So.2d 1046 (La.App. 4th Cir. 1976); Scott v. I. L. Lyons & Co., Ltd., 329 So.2d 795 (La.App. 4th Cir. 1976); Phillips v. Williams, 323 So.2d 808 (La.App. 4th Cir. 1975).
Finally, we turn to the award to Cardwell for lost wages in the amount of $153,110.11. In making this award the trial judge accepted without question or qualification the figure proposed by Dr. Seymour S. Goodman, an economist.
Dr. Goodman's approach was as follows: For the year 1975 when the accident occurred Cardwell earned $12,182. He missed one month of work during that year so that one-eleventh of the total ($1108) was added to arrive at an annual base wage of $13,289. In 1976 the annual base would be increased by 3% for inflation, and from that Cardwell's actual earnings for that year of $8202 would be subtracted to arrive at a loss of wages in 1976 or $5486. A similar exercise would produce a loss of earnings in 1977 until the trial of $2691. Thus, loss of past wages to the date of trial totaled $9284.
For loss of future earnings, Goodman estimated this 41-year old plaintiff's work-life expectancy to be 21.6 years. He estimated that plaintiff could earn the minimum wage of $2.30 per hour during this period of time or an annual figure of $4802 which, when subtracted from the annual pre-injury wage of $13,289, resulted in a future annual wage loss of $8487. The amount needed to produce this figure, adding an inflation factor of 3% per year over the 21.6 years and discounting the figure at 5.78%, amounted to $149,608. This figure added to the wages lost to the time of the trial and subject to a credit for workmen's compensation payments made to Cardwell produced the judgment figure awarded to him.
We find a number of factors which make acceptance of Goodman's figures manifestly erroneous and clearly wrong:
1. As pointed out in our original opinion, the annual figure of $13,289 was based on earnings of 11 months plus one-eleventh. The only established time off from the job in 1975 was twelve days immediately after the May, 1975, accident. If $12,182 was paid for 12½ months instead of 12 months, the annual income figure used throughout Goodman's projections was overstated.
2. Goodman's use of the minimum wage as the only offset against Cardwell's loss of future earnings is not supported by the record. First, as late as December, 1976, over 18 months after Cardwell's accident, he earned $5.75 per hour. Second, he testified that he had been a tack welder in the past, he planned to take a course in welding and he intended to get work as a welder. This would obviously produce far more than the minimum wage. Third, as we pointed out in our original opinion, Cardwell's main problem is his illiteracy. Goodman's hypothesis that Cardwell would earn no more than the minimum wage ignores the prospect of rehabilitation. As we pointed out previously, nothing in the record suggests *264 that Cardwell cannot be taught how to read or write, at least to the extent necessary to improve his chances for employment. Dr. Levy examined Cardwell in February, 1977, for the purpose of determining whether he was disabled for Social Security purposes, and he recommended vocational rehabilitation for Cardwell which would enable him to get a job that did not require him to climb or stay on his feet for eight hours. Dr. Levy clearly inferred that Cardwell was rehabilitable and therefore could earn more than the minimum wage.
3. Goodman's work-life expectancy figure of 21.6 years is unrealistic. He was using averages in all occupations as opposed to plaintiff's occupation before his injury which consisted of heavy, arduous lifting. It is highly unlikely that the average workman could continue on such a job into his sixties, but in Cardwell's case his chances were even less than average because he was already disabled from the 1969 accident.
4. Goodman testified that $149,608 was the amount necessary to produce an annual income of $8487, increased for inflation at the annual rate of 3%. Obviously, if the $149,608 were invested in securities returning 10% the yield would be way over the minimum annual income figure. Goodman insisted that corporate bonds yielding 10% as proposed on cross examination were not as safe as a life insurance annuity on which he based the 5.78%, but common sense disputes Goodman's theory. Even if it is conceded that bonds of the Telephone Company and other strong corporations are not safe investments as Goodman suggests, everyone knows that investments in Building & Loan Associations, which are secured by the Government, pay over 5.78% as do treasury bills of the United States Government. Even an 8% return on the near $150,000 would produce far more than Goodman's required $8487, and after Cardwell earned this amount over his entire work-life expectancy he would still have the principal to leave to his heirs.
The foregoing articulated analysis demonstrates clearly that the award for lost wages in this case was an abuse of the trial court's discretion, manifestly erroneous and clearly wrong. The $149,608 is subject to a considerable reduction when the annual wage figure for 1975 is reduced, the credit for Cardwell's future income is increased well above minimum wage, his work-life expectancy is decreased and a realistic discount factor is applied. Cardwell is entitled to compensation for actual losses. He is not entitled to compensation simply because he cannot perform the same job as before the accident. That element was relevant in his workmen's compensation case which he settled for $3282. In this connection, we specifically incorporate into this opinion by reference our comments in the original opinion concerning Cardwell's compensation settlement.
However, we have reconsidered our original reduction to $10,000 in the light of the probability that Cardwell will require rehabilitation, the trial court's overwhelming endorsement of Cardwell's credibility, and the recognition that the $10,000 does not adequately compensate him for past lost wages. We conclude that a reduction to $50,000 is warranted, and is the most we could possibly award to Cardwell for past and future earnings within the range of anyone's discretion.
We are satisfied that this conclusion is not inconsistent with Folse v. Fakouri, supra, since that case involved a claim for loss of earning capacity by a self employed plaintiff whereas this case involves a straight loss of wages. In the former case a wider range of discretion is necessarily given the trial judge because the loss is not as susceptible to computation as in the latter case.
Accordingly, our original opinion is reinstated but is amended so that the judgment appealed from is amended to reduce judgment in favor of Clifton Cowans to the sum of $500, and to reduce judgment in favor of Kenneth D. Cardwell to the sum of $75,750.
ORIGINAL OPINION REINSTATED AS AMENDED.