**Mrs. Evelyn H. DOMANGUE, etc.**

v.

**EASTERN AIRLINES, INC., et al.**

**Civ. A. No. 75–3006–EJB.**

United States District Court, E. D. Louisiana.

June 17, 1982.

Michael X. St. Martin, St. Martin & St. Martin, Houma, La., Tony B. Jobe, for plaintiff.

Francis G. Weller, Marc J. Yellin, Deutsch, Kerrigan & Stiles, for Eastern Airlines, Inc.

John Volz, U. S. Atty., Roy Blondeau, Asst. U. S. Atty., H. Richmond Fisher, Attorney, U. S. Dept. of Justice, for United States of America.

## MEMORANDUM OPINION AND ORDER

EDWARD J. BOYLE, Sr., District Judge:

The plaintiff, Mrs. Evelyn H. Domangue, individually and on behalf of her minor children, Barry Joseph Domangue, Jr. and Michelle Marie Domangue, now comes before the court for a determination of damages for the wrongful death of her husband, Barry Domangue, in the crash of Eastern Airlines (hereinafter EAL or Eastern) Flight No. 66 on June 24, 1975, in New York.

The defendant, United States of America, stipulated its liability while this action was still pending in the Eastern District of New York. The quantum issues were reserved for determination upon return of the suit to the Eastern District of Louisiana. *See* E.D. La. Record, Doc. 59, Memorandum Opinion and Order, pp. 1–6, for a history of the Domangue case.

EAL, the only other defendant remaining in the suit upon its return to this district, has confessed judgment in the amount of $75,000.00, the maximum award allowed under the Warsaw Convention, as supplement-ed by the Montreal Agreement, which we previously held governed plaintiff's claim against EAL, and has deposited this amount in the registry of this court. E.D.La. Record, Docs. 60, 61; *see* E.D.La. Record, Doc. 59, Memorandum Opinion and Order, pp. 7–17, finding Eastern liable to plaintiff under the Warsaw Convention as supplemented by the Montreal Agreement. Thus, we deal only with the quantum issues involved in the plaintiff's claims against the United States of America.

Plaintiff's right to sue the United States of America derives from the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* Under the provisions of this act, the quantum issues were tried to the court. 28 U.S.C. § 2402. Following the testimony of plaintiff, her two minor children and the deceased's father, the parties agreed to submit to the court the reports of experts concerning the deceased's past and future lost earnings and the deposition of W. T. Strain, an employee of Brown & Root, Inc., in lieu of live testimony.

It is well settled that the elements and measure of damages under the Federal Tort Claims Act are as provided by the law of the state where the tort occurred, which in this case would be the law of New York. *Ferrero v. United States,* 603 F.2d 510, 512 (5th Cir. 1979); *Simpson v. United States,* 322 F.2d 688, 690 (5th Cir. 1963). The parties, however, have stipulated the law to be applied to the quantum issues is "the law of Louisiana and any applicable Federal treaty and statute." E.D.N.Y. Record, Doc. 53, ¶ 5. Therefore, Louisiana law, where not contrary to the provisions of the Federal Tort Claims Act, will govern our determination of the quantum issues raised by plaintiff.

Upon a prior motion of the United States of America, we restricted plaintiff's claim against the United States of America to the amount requested by plaintiff in her first administrative claim, $2,500,000.00 for wrongful death. E.D.La. Record, Docs. 44, 49.[1] Under the Louisiana wrongful death

---

1. As a result of this ruling, plaintiff's claim for property damage and her "survival action," her right to claim damages for personal injuries

statute, LSA–CC Article 2315, the elements of damages which may be claimed by her are: (1) loss of love, affection, companionship and grief and mental anguish; (2) loss of personal services; (3) loss of support from date of death to day of trial and loss of future support from date of trial; (4) funeral expenses; and (5) medical expenses. *Roundtree v. Technical Welding and Fabrication Co., Inc.*, 364 So.2d 1325, 1330 (La. App. 4th Cir. 1978); *Blancher v. Samuels*, 354 So.2d 213, 223 (La.App. 4th Cir. 1977), *writs denied*, 355 So.2d 257, 263 (La.1978); *Andrus v. White*, 236 La. 28, 106 So.2d 705, 706 (1959). Plaintiff has made no claim for any pecuniary loss resulting from the loss of personal services of the deceased or for medical expenses incurred by her, individually or on behalf of her minor children, and no evidence was adduced at trial in support of such items. Therefore, we find plaintiff is not entitled to be compensated for the loss of her husband's services or for any medical expenses which were incurred. *Diefenderfer v. Louisiana Farm Bur. Mut. Ins. Co.*, 383 So.2d 1032, 1036 (La.App. 1st Cir. 1980).

## I. LOSS OF LOVE, AFFECTION AND COMPANIONSHIP AND GRIEF AND MENTAL ANGUISH

█ Damages for wrongful death include both the loss of the decedent's love and affection and the grief and mental and physical anguish suffered by the survivor. *Blancher v. Samuels*, supra. Louisiana law, however, has not sanctioned separate monetary awards for distinct elements of nonpecuniary damages. *Croce v. Bromley Corp.*, 623 F.2d 1084, 1094–1096 (5th Cir. 1980); *Coco v. Richland Gen. Contractors, Inc.*, 411 So.2d 1260, 1262–1264 (La.App. 3rd Cir. 1982). In determining the proper award for the loss of love and affection and the grief and anguish suffered by the decedent's widow and two minor children, the court should consider the closeness and congeniality of the family relationship the decedent shared with his wife and two children. *Dyson v.*

*Gulf Modular Corp.*, 345 So.2d 1222, 1225 (La.App. 1st Cir. 1977).

Both parties stipulated to the legality of the marriage between Barry and Evelyn Domangue and that Barry, Jr. and Michelle were the lawful issue of that marriage. The uncontroverted evidence here establishes that Barry Domangue was a loving and devoted husband and father. Evelyn and Barry Domangue had led a happily married life together for ten years at the time of his death. Mrs. Domangue's testimony concerning the close and loving relationship she had with her husband was corroborated by the deceased's father and mother. The deceased's two children, Barry, Jr., born August 9, 1966, and Michelle, born July 13, 1969, testified their father had always spent a substantial amount of time with them. The evidence further shows the closeness and congeniality of the Domangue family were not affected by Barry Domangue's overseas employment which required him to be absent from his home for several months at a time.

In addition to the loss of love and companionship suffered by the Domangue family, we recognize the inevitable grief and mental anguish accompanying the untimely death of a loving and loved husband and father. Moreover, the Domangue family spent two agonizing days before learning Barry Domangue had perished in the airplane crash.

█ Plaintiff contends she should be awarded $125,000.00 for the loss of love and affection of her husband, and the children should receive $60,000.00 each. Defendant argues that $70,000.00 to Mrs. Domangue and $40,000.00 to each of the children would constitute adequate recovery. Under Louisiana law, every personal injury case must be evaluated according to its own peculiar facts and circumstances to determine the damages sustained. *Riley v. Frantz*, 253 So.2d 237, 241 (La.App. 4th Cir. 1971); *Profit v. Linn*, 346 So.2d 253, 256 (La.App.

suffered by her deceased husband as a result of the accident, are no longer before the court for

determination.

1st Cir. 1977). The trier of fact is accorded much discretion in assessing general damages such as the loss of love and affection suffered by the Domangue family. LSA–C.C. Art. 1934(3); *Boswell v. Roy O. Martin Lumber Co.*, 363 So.2d 506, 507 (La.1978). Similar awards made in other cases do not stand as a scale of uniformity but serve as aides to determine whether the trial court has abused its discretion. *Reck v. Stevens*, 373 So.2d 498, 500–501 (La.1979); *Miller v. Thomas*, 246 So.2d 16, 19, 258 La. 285 (1971).

After examining the cases cited by the parties [2] and other applicable Louisiana case law and after considering the evidence relating to the closeness of the Domangue family and the loss of love, affection and companionship, as well as the sorrow and mental anguish, suffered by the deceased's wife and two children, we find Mrs. Evelyn H. Domangue is entitled to an award of $100,000.00 as reasonable compensation for the loss of her husband and Barry, Jr. and Michelle are each entitled to $50,000.00 for the loss of their father.

**2.** Plaintiff brought to the court's attention the case of *Caldarera v. Eastern Airlines, Inc.*, 529 F.Supp. 634 (W.D.La.1982), also arising out of the crash of Eastern Flight No. 66. A copy of the decision is attached to Document 77, E.D.La. Record. Judge Earl E. Veron awarded a husband $400,000.00 for the loss of his wife and awarded the sole surviving four year old son $400,000.00 for the loss of his mother. The court, however, pointed to the distinctive facts of the case before it in making these awards. The court noted the suffering of the survivors of the Caldarera family had been greatly compounded by the loss of three of its five family members (Mr. Caldarera's wife, his mother and another of his sons) in the fatal aircrash. Furthermore, a clinical psychologist testified to the severity of depression suffered by Mr. Caldarera as a result of this loss. The child's loss was magnified by his very young age; he had been deprived of the all-important support, guidance and nurturing of his mother during his most formative years. The persuasive authority of the Caldarera case is diminished because none of the above mentioned factors are present in the case now before us.

**3.** The Louisiana courts do not appear to require proof of the extent of support provided by the deceased to a surviving wife or child before the claimant may recover for loss of support. Although the issue is never discussed, the courts appear to assume full support absent evidence to the contrary. *See* for example, *Cheatham v.*

## II. LOSS OF SUPPORT

The settled law in Louisiana is that damages for loss of support are speculative in nature and cannot be calculated with mathematical certainty. The most a court can do is to exercise sound judicial discretion and award an amount which, considering all the circumstances, seems just to both parties and is not unduly oppressive to either. *Viator v. Gilbert*, 253 La. 81, 216 So.2d 821, 822–823 (1968); *McFarland v. Illinois Central Railroad Co.*, 241 La. 15, 127 So.2d 183, 187 (1961). Factors which should be weighed in determining the amount due for loss of support include the deceased's work record and past performance, the amount of his earnings in previous years and the probability or improbability that he would have been capable of earning comparable or similar amounts for a number of years during his work life expectancy. *Viator v. Gilbert*, supra; *Johnson v. International Ins. Co.*, 347 So.2d 1279, 1282 (La. App. 1st Cir. 1977).[3] Another factor to be

*City of New Orleans*, 378 So.2d 369, 378 (La. 1980); *Blanchard v. Rodrigue*, 340 So.2d 1001, 1005 (La.App. 1st Cir. 1976); *Johnson v. International Ins. Co.*, 347 So.2d 1279, 1282–1283 (La.App. 1st Cir. 1977).

From the evidence we can infer Barry Domangue had supported his wife, Evelyn, and two children, Barry, Jr. and Michelle, to the best of his ability without unreasonable portions of his earnings being used for his own consumption, and probably would have continued to support them in the same manner throughout his work life expectancy. The Domangues' tax returns for 1970 through 1975 show compensation received by Barry Domangue only, which suggests he was the only income earner in the family. Mrs. Domangue did state, however, that she had worked while married to the deceased, although she did not say during which years. There is no suggestion the children earned income which was used to help support themselves or the family. Thus, the evidence would seem to demonstrate that Barry Domangue supported his family with his earnings, which earnings increased yearly, except in 1972.

The testimony of the children and Mrs. Domangue reveals Mr. Domangue did not indulge in leisure activities which required him to spend a significant amount of time or money on himself to the exclusion of his family. Given this evidence and the evidence of the love

considered is a deduction for the decedent's personal living expenses, sometimes referred to as consumption factors. *Roundtree v. Technical Welding and Fabrication Co.*, supra, at 1334. Under Louisiana law, a wife may be compensated for the loss of her husband's support for the period extending from the date of his death to the end of his work life expectancy. *Cheatham v. City of New Orleans*, 378 So.2d 369, 379 (La.1979). The Louisiana courts have limited recovery to minor children for the loss of support of a parent to the period of their minority. *Id.; Johnson v. International Ins. Co.*, supra, at 1282–1283. Mrs. Domangue claims loss of support both for herself and on behalf of her two minor children in the amount of $1,133,364.78, or $219,336.78 for past loss of support and $914,028.00 for the anticipated future loss. Defendant does not dispute that Mrs. Domangue, Barry, Jr. and Michelle are entitled to recover for this element of damages. Indeed, in its trial memorandum it urges awards of $119,-700.00 for past loss of support and $193,-700.00 for loss of support in the future would be proper.

Both parties have submitted economists' reports in support of their respective assertions of the loss of support suffered by plaintiff and her two minor children.[4] Trial Exhibits, November 30, 1981, P–2 and Def. 1. The report of plaintiff's expert, Dr. Seymour S. Goodman, is premised on the assumption the deceased would have continued to work overseas for the remainder of his work life expectancy, a period of 34.2 years as of the date of his death. Dr. Goodman computed the deceased's past lost wages using the hourly wage rates for 1976 through 1981, supplied by Mr. W. T. Strain from Brown & Root, Inc., and adding an annual twenty percent overseas bonus. Future lost earnings were then computed from the estimated base wage as of the time of trial. In addition, Dr. Goodman's computation of personal maintenance expenditures took into consideration "that two thirds of Mr. Domangue's personal consumption of food would have been provided at no cost to him by his employer while working overseas."[5] Trial Exhibits, November 30, 1981, P–2 at p.5. The underlying assumption of continued employment overseas after 1975 is unsupported by the evidence and is contrary to our findings herein.

At the time of his death, the deceased was employed by Brown & Root Foreign Subsidiaries as an anchor operator and was working on a barge in the North Sea. Plaintiff contends her husband would have continued working abroad, either in the North Sea or the Bay of Campeche in the Gulf of Mexico, as he enjoyed the work and the pay was favorable. The evidence does support the conclusion the deceased would have worked in the North Sea for the remainder of 1975. At the time of the crash, Mr. Domangue was returning to his job overseas. Furthermore, Mrs. Domangue, expecting the deceased to remain overseas for several months, had planned an August trip to Europe to visit her husband.

The evidence, however, does not support a finding that Mr. Domangue would have

and harmony existing between and the close relationship of the Domangue family, we infer the deceased contributed and would have continued to contribute a substantial portion of his earnings to the support of his family.

4. Since the experts did not testify at trial their opinions were not tested by cross-examination.

5. Dr. Goodman's determination of the deceased's personal maintenance expenditures not only was based on the erroneous assumption of continued overseas employment, but also was calculated in a novel manner not yet embraced by the Louisiana courts. Dr. Goodman used a "separable income" methodology which reduced the percentage of the deceased's earnings arguably used for his own personal benefit from an average range of 22% to 34% to 5.8% prior to the date of trial and 7.8% thereafter. The economists' reports accepted by the Louisiana courts have systematically employed the traditional percentage personal consumption calculation used by Dr. Boudreaux, the defendant's expert, for example, the 22% to 34% range for a family of four. *Cheatham v. City of New Orleans*, supra, in the text; *Hunter v. Office of Health Services, etc.*, 385 So.2d 928, 934 (La.App. 2d Cir.), *writ denied*, 393 So.2d 737 (La.1980); *Stewart v. Schmieder*, 376 So.2d 1046, 1052 (La.App. 1st Cir. 1979). We are unable to accept Dr. Goodman's figures absent authority for his position.

continued to work overseas after 1975, even if he had desired to do so.[6] It is improbable that Mr. Domangue's employment in the North Sea would have continued. Beginning in 1976, work in that area began to decline noticeably and by 1981, Brown & Root had only one barge working in the North Sea. Record, Doc. 42, Deposition of W. T. Strain, pp. 37–48. The remaining barge was not, apparently, the barge upon which the deceased had worked. Record, Doc. 42, p. 48. Mr. W. T. Strain, personnel supervisor, Foreign Marine Division, Brown & Root, Inc., testified he did not think Barry Domangue would now be working in the North Sea. Record, Doc. 42, p. 48.

It appears plaintiff would have us conclude her husband would have been reassigned for the remainder of his work life expectancy to the Bay of Campeche, Gulf of Mexico, when work opportunities in the North Sea diminished. The evidence of such employment is too speculative. Mr. Strain testified Barry Domangue's chances for working in the Bay of Campeche would have been excellent because his barge was moved to that area and workers performing the type of job he was generally follow their barge wherever it is assigned. Record, Doc. 42, pp. 36, 37. Robert Peter Domangue, the deceased's father, testified he had worked overseas with Brown & Root since 1969, had worked on the same barge with Barry, as his son's supervisor, and was now working in the Bay of Campeche. His testimony reveals, however, that the barge on which he presently works in the Gulf of Mexico, Barge 297, which he brought to that area from the North Sea in October, 1978, is not the same barge to which he was assigned in 1974 and 1975, which was Barge 324, and, thus, is not the same barge on which the deceased was working at the time of his death. It is unclear from the evidence whether Barge 324 is now actually working in the Gulf of Mexico or whether Mr. Strain was referring to Barge 297, the

barge to which the deceased's father has been assigned since 1978, when he testified the deceased's barge was now in the Bay of Campeche, Gulf of Mexico. Furthermore, Robert Peter Domangue testified work in the Gulf of Mexico is seasonal as it is in the North Sea. Complicating the issue is the fact that Brown & Root has fifteen to eighteen barges working throughout the world, only six of which are located in the Bay of Campeche. Record, Doc. 42, pp. 50, 79. Even assuming the deceased's barge is presently assigned to the Gulf of Mexico, we still cannot conclude he would have continued to work thereon. Mr. Strain testified that despite the general rule that workers follow their barges to new assignments, each individual remains "highly subject to being assigned to another job" depending upon the needs of jobs in progress in other areas. Record, Doc. 42, p. 37.

Absent evidence to support the premise upon which Dr. Goodman's report rests, we must reject his calculations of the deceased's past and future lost earnings. We further note there are other aspects of Dr. Goodman's report which cause us to reject his calculations, for example, his use of an age-earning factor and his assumption of support to Barry, Jr. to age 23 and to Michelle to age 21, the current respective ages of first marriages for males and females, as reported by the U. S. Bureau of Vital Statistics of the Department of Health and Welfare (*Monthly Vital Statistics Report*). We find the approach used by the defendant's expert, Dr. Kenneth J. Boudreaux, more reasonable and in keeping with the circumstances of the case supported by the evidence and the law of Louisiana. Dr. Boudreaux's report sets forth a range of estimates varying according to which productivity factor is used, a 3% or 6% factor or some other rate which would result in the deceased's earnings as of the time of trial being $50,000.00, and whether the children are supported through age eighteen or twenty-one.

---

6. Mrs. Domangue's trial testimony that her husband intended to work overseas until such time as he could retire as he enjoyed overseas work much more than similar work at home is brought into question by her deposition testimony that she and her husband were trying to save money to build a house and her husband planned on working away from home "as long as it would take to get enough money ahead." Record, Doc. 58, p. 14.

Dr. Boudreaux's report provides one set of figures, designated Base 1, representing the present value of lost earnings from the time of the accident to the time of trial and from the time of trial to end of the deceased's expected work life, assuming support for the deceased's widow through his entire work life expectancy, conceded to be 34.2 years as of the time of his death, and for the two children, to the age of eighteen or the age of twenty-one. As previously noted, minor children are only entitled to recover for the loss of support of a parent during their minority, or until they reach eighteen years of age. Thus, Dr. Boudreaux's estimates for loss of support to the children to age twenty-one, designated "spouse-21" in his report, are inapplicable and rejected.

Dr. Boudreaux arrived at these amounts by first calculating the deceased's base gross income for the year of his death. Dr. Boudreaux stated he derived the $23,493.96 base annual income figure by computing from income tax returns "Mr. Domangue's earnings in the twelve months immediately preceding the accident." [7] He then projected the deceased's earnings up through the time of trial and, then again, from the time of trial to the end of his work life, using a 3% and a 6% annual productivity wage increase factor. The projected earnings were then adjusted for the amount the deceased would have spent on himself, which amount Dr. Boudreaux calculated would vary between 22% and 34% depending upon the number of children in the household, and for income taxes. Dr. Boudreaux then figured the present value of the estimated future earnings using a discount rate based upon an annual pre-tax rate of return of 11.5%. The rate was adjusted downward as necessary in each year of work life to reflect the taxability of income from the implied investments. His report, however, is deficient in that it contains only the end

results of his calculations. Absent more precise information concerning the annual deductions made for taxes and personal consumption, we cannot verify Dr. Boudreaux's figures.

In a separate calculation, designated Base 2 in his report, Dr. Boudreaux also presented results assuming the deceased could be earning $50,000 per year at the time of trial. This assumption would appear to rest on the testimony of Mr. W. T. Strain that at the time of trial an overseas anchor operator would be earning approximately $53,000.00 per year. Record, Doc. 42, p. 50. Having found that the evidence does not support a conclusion of continued overseas employment on the part of the deceased, we must reject the Base 2 calculations contained in Dr. Boudreaux's report.

■ Looking to Dr. Boudreaux's Base 1 calculations, the figure of $125,676.07 would seem reasonable compensation for the past loss of support from a man who would have been earning approximately $23,500.00 in the year of his death and whose earnings would have increased 6% per year. With respect to future loss of support, we find the present value figure of $310,840.13 would reasonably compensate plaintiff and her two children to age 18 years for the loss of Barry's support during the remaining 27.8 years of his work life expectancy. A 6% annual increase in earnings is reasonable in light of the deceased's young age, his sustained work record and the not unreasonable pre-tax rate of return of 11.5% used by Dr. Boudreaux. *See Mizell v. State, Through La. Dept. of Highways*, 398 So.2d 1136, 1143–1144 (La.App. 1st Cir. 1981); *Cardwell v. Jefferson Rental Division*, 379 So.2d 255, 264 (La.App. 4th Cir. 1976).

The deceased was twenty-nine years old at the time of his death and had worked steadily since the fall of 1970. Due to the nature of his principal occupation as an

---

**7.** Our efforts to duplicate Dr. Boudreaux's calculation do not yield the same result. Prorating the deceased's 1974 income of $23,887.55 over a twelve month period yields a monthly income of $1,990.63. Thus, on a pro rata basis, the deceased's income for six months in 1974

would be $11,943.78. Adding this amount to his earnings for six months in 1975, or $10,495.25, would yield a base annual income for "the twelve months immediately preceding the accident" of $22,439.03.

offshore worker, he was not employed by a single employer for a full twelve month period. Mr. Domangue's income tax returns for the five years preceding his death, however, show a sustained income with yearly increases except in 1972. Given Mr. Domangue's work history and familial responsibilities, it is reasonable to assume he would have experienced continued increases in his earning power at least for several years.

Mr. Strain testified the job of anchor, or tower, operator was one which could be performed by a man sixty-five years of age. Record, Doc. 42, pp. 34–35. He also testified the turnover rate for anchor operators was low and that the average age of such workers was mid-forties. Record, Doc. 42, p. 35. It is likely the deceased would have continued in the same or similar employment[8] during his work life expectancy, though not necessarily overseas.

Dr. Boudreaux's percentage reductions for the deceased's personal maintenance expenditures are in keeping with those accepted by the Louisiana courts and are reasonable in light of the evidence, discussed above, supporting the conclusion of stateside employment for the deceased during his work life expectancy, except for the remainder of 1975. *See generally* cases cited note 4 *supra.* It would appear Barry would have remained in the North Sea during that year. While overseas, his personal maintenance expenditures would have been substantially less because his board and lodging would have been provided for him by Brown & Root, Inc. Dr. Boudreaux did not use a lower percentage reduction for personal consumption expenditures for the year 1975, but instead, presumably offset the value of these overseas benefits against the arguably large portion of his earnings he would have used for personal purposes during the months he was at home. Furthermore, we are unable to place a value on the board and lodging provided to Barry overseas. Plaintiff contends in her pre-trial memoranda that the value of these benefits as of 1976 was $25.00 per day. E.D.La. Record, Doc. 57, p. 1. This figure, however, is not supported by any evidence, nor is there evidence of the worth of these benefits for 1975.

█ Plaintiff argues Dr. Boudreaux's calculations are incorrect as they make adjustments for income taxes. Plaintiff contends Louisiana law requires the court to compute loss of past and future support based on the gross income of the deceased. The Louisiana circuits, however, are divided on the issue of whether "gross" or "net" income should be awarded for lost earnings recoveries. The First and Third Circuits have adopted the position that taxes should not be considered in awarding damages for loss of support, largely for the reason that the uncertainty of future tax rates makes a deduction for taxes speculative. *Reeves v. La. & Ark. Rwy. Co.,* 304 So.2d 370, 376–377 (La.App. 1st Cir. 1974); *Hawthorne v. Southeastern Fidelity Insurance Co.,* 387 So.2d 26, 31–32 (La.App. 3rd Cir. 1980). The Second and Fourth Circuits, however, have traditionally taken the position that net wages or income should be used (*Hardie v. Pylant,* 375 So.2d 189, 195–196 (La.App. 2d Cir. 1979); *Edwards v. Sims,* 294 So.2d 611, 616–617 (La.App. 4th Cir. 1974)), although the Fourth Circuit has shifted its position, stating that courts have the option of using either gross or net income. *Roundtree v. Technical Welding & Fabrication Co.,* supra, at 1335. The Fifth Circuit recently concluded that under Louisiana law "[w]hen awarding the loss of future wages, the trial court has the option of

---

**8.** The deceased's father, an overseas employee of Brown & Root, Inc. and Barry's immediate superior at the time of the accident, testified his son would probably have been promoted to tower foreman and then barge foreman if he had lived. Mr. Robert Domangue, however, did not have the authority to decide who would actually receive promotions; he could only recommend individuals for advancement. No employee of Brown & Root, Inc. with authority to grant promotions testified Barry Domangue was likely to receive such promotions or was capable of performing the greater responsibilities involved in either job. Furthermore, the evidence is devoid of any reference to the deceased's past work performance from which, perhaps, we could infer probable promotions.

using gross income, net income, or any figure in between that was reported on the victim's last tax return as a representation of his statement of wages. *Morgan v. Liberty Mutual Insurance Co.,* 323 So.2d 855, 863 (La.App.1975). *See also Roundtree v. Technical Welding & Fabrication Co.,* 364 So.2d 1325, 1335 (La.App.1978)." *Fenasci v. Travelers Ins. Co.,* 642 F.2d 986, 989 (5th Cir. 1981). In *Fenasci,* the Fifth Circuit held a district court had not abused its discretion in not allowing evidence of net income during trial of the damages issue. Nevertheless, the reasoning used by the court would seem to require the conclusion that it is also not an abuse of discretion to allow evidence of net income in determining an award for economic loss. Therefore, Dr. Boudreaux's calculations using earnings net of income taxes are not invalid.[9]

Accordingly, we find reasonable sums for past and future loss of support to be $126,000.00 and $311,000.00, respectively, or a total of $437,000.00. These awards are apportioned amongst the widow and children as follows: Mrs. Domangue, $75,600.00, Barry, Jr., $25,200.00, and Michelle Marie, $25,200.00 for past loss of support and $248,800.00 to Mrs. Domangue, $18,660.00 to Barry, Jr., and $43,540.00 to Michelle Marie for future loss of support.[10]

## III. FUNERAL EXPENSES

■ Louisiana law provides for the recovery of reasonable funeral expenses. *Olinde v. State,* 391 So.2d 1243, 1248 (La. App. 1st Cir. 1980). As a general rule, however, minors may not recover for this element of damages as they do not incur the liability for this expense. *Andrus v. White,* supra, 106 So.2d at 707; *Johnson v. International Ins. Co.,* supra.

Plaintiff claims funeral expenses totaling $2,446.50. The United States has not disputed this amount. Accordingly, we find plaintiff, individually, is entitled to receive $2,446.50 in damages for funeral expenses.

## IV. PREJUDGMENT AND POST–JUDGMENT INTEREST UNDER WARSAW CONVENTION AND MONTREAL AGREEMENT

■ Although Eastern has already confessed judgment in the amount of $75,000.00, the maximum sum recoverable under the Warsaw Convention as supplemented by the Montreal Agreement, plaintiff argues she is entitled to recover prejudgment and post-judgment interest from Eastern over and above the $75,000.00 possible maximum award. Her position is that although the Montreal Agreement stipulates that the $75,000.00 limitation includes legal fees and costs, there is absolutely no mention that the limitation is intended to include interest and had the carriers intended to include interest in the limitation, they would have so specified, as they did legal fees and costs.

Plaintiff relies on the case of *Leppo v. TWA,* No. 2177–1973 (S.Ct.N.Y.Cty. March 10, 1976 unreported),[11] which held that the limitation of liability did not include interest. Apparently, the issue was not considered by an appellate court since we are advised that the case subsequently settled.[12] Plaintiff also calls the court's attention to

9. Plaintiff also argued that if earnings net of taxes were to be used, Dr. Boudreaux's calculations were still erroneous because he did not apply the provisions of the Economic Recovery Tax Act of 1981, Public Law 97–34, 1981, which allows for exclusion of "foreign earned income from gross income." This argument is untenable because, as discussed in the text, the evidence does not support the assumption that the deceased would have continued to be employed overseas and receive income "from sources within a foreign country or countries," as required by the Act.

10. The parties have stipulated, E.D.La. Record Doc. 76, that the award for past and future loss of support should be apportioned as follows: past loss—60% to Mrs. Domangue, and 20% to each of the children; future loss—80% to Mrs. Domangue, 6% to Barry, Jr., and 14% to Michelle. We find such divisions to be reasonable.

11. A copy of the decision rendered in *Leppo v. TWA,* No. 2177–1973 (S.Ct.N.Y.Cty. March 10, 1976) is attached to Document 56, Plaintiff's Memorandum for Prejudgment Interest, in the E.D.La. Record.

12. *See* E.D.La. Record Document 56, p. 4.

several cases in this district arising out of the same aircrash in which Barry Domangue died. In the case of *Hickey v. Eastern Airlines*, No. 76–237F (E.D.La. 1981), the issue of interest was never adjudicated as the case settled. Judge Mitchell, however, indicated he would have been inclined to award interest from the date of judicial demand to the date Eastern deposited monies in the court registry over and above the $75,000.00 limit because the litigation in the *Hickey* case had been delayed over the years through no fault of the plaintiff. *See* Reporter's Transcript of Proceedings at p. 10, attached to Doc. 56, E.D.La. Record. Most recently, in the cases of *Dispenza v. Eastern Airlines*, No. 75–2412E (E.D.La.1982) and *Winbourne v. Eastern Airlines*, No. 75–2715C (E.D.La. 1982), also arising out of the crash of Eastern Flight No. 66, the issue was decided and interest in addition to the maximum $75,-000.00 provided for in the agreement was held recoverable. Although Judge Cassibry in *Dispenza* did not assign reasons for his award of prejudgment interest under the Warsaw Convention and Montreal Agreement, Judge Collins in *Winbourne* did.

Judge Collins stated the Warsaw Convention and Montreal Agreement contemplated prompt recovery to the passenger from the airline in return for the maximum damage award limitation. He considered the purpose of these agreements to be frustrated where, as in the case before him, litigation is protracted for six years following the accident.[13] "Thus, in order to effectuate the purposes of the Warsaw Convention and the Montreal Agreement, plaintiff must be awarded prejudgment and post-judgment interest." C.A. No. 75–2715C, Record, Doc. 30, p. 3. Judge Collins also noted, "[a]n additional equitable consideration militating in favor of such an award is that airlines would be unjustly enriched if allowed to interminably litigate the issues and withhold from survivors that to which they are entitled by law." *Id.*

Eastern disagrees with the plaintiff's position arguing that the purpose of the Warsaw Convention is to protect airlines from financial disaster by establishing a limit of recovery for injuries to the international passenger. Awarding anything over the $75,000.00 limit would be abrogating the intent of the high contracting parties to the agreement. According to Eastern, if the drafters had intended for interest to be excluded from the limitation, a specific provision to that effect would have been inserted.

Eastern's argument must prevail. Prejudgment and post-judgment interest are a measure of damages, and the clear intent of Article 22 is to limit recoverable damages to $75,000.00. "[I]n construing [a] treaty, as other contracts, we give consideration to the intent of the parties so as to carry out their manifest purpose." *Board of County Com'rs v. Aerolineas Peruanasa, S. A.*, 307 F.2d 802, 806–807 (5th Cir. 1962). Secretary of State Cordell Hull, in transmitting the Warsaw Convention to the Senate in 1934 indicated that the purpose of the liability limitation was "to fix at a definite level the cost to airlines of damages sustained by their passengers and of insurance to cover their damages." *See Reed v. Wiser*, 555 F.2d 1079, 1089 (2d Cir.), *cert. denied*, 434 U.S. 922, 98 S.Ct. 399, 54 L.Ed.2d 279 (1977).

---

13. In the instant case, Eastern Airlines was not responsible for the protracted litigation. Eastern has always maintained plaintiff's claims against it were governed by the Warsaw Convention as supplemented by the Montreal Agreement and, thus, that it is liable to plaintiff in the amount of $75,000. Plaintiff originally agreed with Eastern and sought and obtained a summary judgment establishing Eastern's liability under the Convention. Eastern appealed asserting procedural deficiencies in the district court's handling of the motions and the Second Circuit reversed the trial court's determination on these procedural grounds. The Court of Appeals, however, recommended plaintiff renew her motion. At this juncture in the litigation, plaintiff changed her mind and contested the application of the Warsaw Convention and Montreal Agreement to her case. Plaintiff maintained this position before this court. It was not until we granted Eastern's motion for summary judgment finding the Warsaw Convention/Montreal Agreement governed the claims between Eastern and plaintiff that the issue was resolved. *See* E.D.La. Record, Doc. 59, Memorandum Opinion and Order, pp. 1–16 for a thorough discussion of the history of the Domangue case.

The *Reed* court went on to conclude, "at no time has this country ever abandoned the basic principle that, whatever the limits may be, air carriers should be protected from having to pay out more than a fixed and definite sum for passenger injuries sustained in international air disasters." *Id.* Thus, the court refused to permit a suit for an unlimited amount of damages against a carrier's employees for personal injuries, because to do so would undermine the limitation purpose of Article 22 of the convention.

The *Reed* case is also relevant to the instant case because it concerned a situation, like that of interest, where the terms of the treaties were silent. The court held that the treaty's silence on the issue of whether the plaintiff could recover from the carrier's employees a sum greater than that recoverable against the carrier itself, did not mean that the employees were not covered. To permit such a suit "would unquestionably undermine the purpose behind Article 22, since it would permit plaintiffs to recover from the carrier through its employees damages in excess of the Convention's limits." *Id.*

Although inapposite as not involving the Warsaw Convention and Montreal Agreement, the Fifth Circuit has allowed prejudgment interest in an airplane crash case brought in admiralty under the Death on the High Seas Act. *National Airlines, Inc. v. Stiles*, 268 F.2d 400, 405 (5th Cir.), *cert. denied*, 361 U.S. 885, 80 S.Ct. 157, 4 L.Ed.2d 121 (1959). This is because the Death on the High Seas Act calls for a recovery that is "a fair and just compensation for the pecuniary loss sustained," (46 U.S.C. § 762) and the court held that awarding prejudgment interest was the only way to insure that plaintiff received full value for her pecuniary loss. The policy behind this Act, however, differs from that behind the Warsaw-Montreal Agreement, in which the goal is to place a ceiling on the amount of damages recoverable from the carrier. In this sense, Warsaw-Montreal is not intended to truly provide "fair and just compensation for the pecuniary loss sustained," because the compensation is limited to $75,000.00 regardless of the circumstances. More pertinent to the instant case, the court pointed out that "the general rule in the common law ha[s] traditionally been that prejudgment interest could not be allowed on an unliquidated tort claim." *Id.*

The intent of the parties to Warsaw-Montreal was to protect the airline industry from bankruptcy by placing a ceiling on carrier liability for damages. Interest is an element of damages and, thus, is meant to be included in the $75,000.00 limit. Accordingly, plaintiff may not recover prejudgment or post-judgment interest against Eastern on the $75,000.00 recovery provided for in the Montreal Agreement and allowed herein. Under the express language of the Agreement, said $75,000.00 also includes legal fees and costs. 49 U.S.C. § 1502.

## V. CONCLUSION

The plaintiff, individually, is entitled to damages in the following amounts: for loss of love, affection and companionship and grief and mental anguish, $100,000.00; for loss of support, both past and future, $324,-400.00; for funeral expenses, $2,446.50, and to judgment for the total sum of $426,-846.50. We further find plaintiff, on behalf of her minor son, Barry Domangue, Jr., is entitled to recover damages as follows: for loss of love, affection and companionship and grief and mental anguish, $50,000.00; for loss of support, past and future, $43,-860.00, and to judgment for the further total sum of $93,860.00. We further find that the plaintiff, on behalf of her minor daughter, Michelle Marie Domangue, is entitled to damages as follows: for loss of love, affection and companionship and grief and mental anguish, $50,000.00; for loss of support, past and future, $68,740.00, and to judgment for the further total sum of $118,740.00, the aggregate total of all damages recoverable from the defendants jointly, severally and in solido being $639,446.50, subject, however, to Eastern Airlines' liability therefor being limited as aforesaid to $75,000.00 and subject further to said $75,-000.00 being apportioned amongst the widow and two children as follows: Mrs. Domangue, $45,000.00, Barry, Jr., $15,000.00,

and Michelle Marie, $15,000.00,[14] said judgments as to the United States of America to bear post-judgment interest and costs as provided by law.

Under 28 U.S.C. § 2674, an award of prejudgment interest against the United States of America is precluded. The Act, however, does not prohibit recovery of post-judgment interest against the U. S. A. 28 U.S.C. § 2411(b). Furthermore, 28 U.S.C. § 2412 allows a prevailing plaintiff to recover costs of the proceedings.

---

**14.** The parties have stipulated, E.D.La. Record, Doc. 76, that the $75,000 award against EAL should be apportioned 60% to Mrs. Domangue and 20% to each of the children. We find such division to be reasonable.