Ann M. BURGIO, as Administratrix of the Estate of Joseph M. Burgio, deceased, and Ann M. Burgio, individually, Plaintiffs,

v.

McDONNELL DOUGLAS INC., individually and d/b/a Douglas Aircraft, Inc. and Douglas Aircraft, Inc., Defendants.

No. 88 C 3092.

United States District Court, E.D. New York.

Sept. 28, 1990.

Law Offices of Leonard L. Finz, P.C. (Joseph Lichtenstein, of counsel), New York City, for plaintiffs.

Bryan Cave McPheeters & McRoberts (Robert Dwyer, Steven R. Haffner, Andreas F. Lowenfeld, Linda J. Silberman, of counsel), New York City, for defendants.

## MEMORANDUM AND ORDER

NICKERSON, District Judge:

This action arises out of an airplane accident on September 17, 1987 at Barksdale Air Base in Louisiana which resulted in the death of Sgt. Joseph M. Burgio. On September 16, 1988, Sgt. Burgio's widow, Ann M. Burgio, suing under letters of administration issued in Suffolk County, New York, as executrix of his estate and in her individual capacity, brought this wrongful death action in the Supreme Court of the State of New York against defendants McDonnell Douglas, Inc., a Maryland corporation with a principal place of business in Missouri, and Douglas Aircraft, Inc., a division of McDonnell Douglas, Inc. located in California. Defendants removed the case to federal court. The parties stipulated that defendants would not contest liability, thereby leaving at issue only damages.

Defendants have moved for an order *in limine* determining which state's law should apply to the issue of damages. They argue that the court should look first to Louisiana choice of law rules, and that these dictate application of New York internal law. Plaintiff contends that the court should look only to Louisiana's internal law of damages.

Unlike New York, Louisiana allows damages for loss of consortium and for emotional grief or psychological injury, and does not require that collateral benefits received by plaintiff on account of the death be deducted from any judgment.

## I.

### A.

The facts regarding the couple's domicile and where plaintiff now lives are not in dispute. Plaintiff and the decedent were married in New York on July 8, 1982, shortly after the decedent's enlistment in the United States Air Force. Both were then residents of New York. Shortly after being married, the two moved to live near the Spangdahlem Air Base in West Germany where the decedent was stationed. They lived there from 1982 until 1985, at which point decedent was assigned to Barksdale Air Base in Louisiana, to which they moved. They lived there until decedent's death in 1987. Plaintiff then left Louisiana and returned to New York where her parents and the decedents' parents live and where she obtained letters of administration.

### B.

The parties agree that since the airplane accident occurred on a federal military base, this wrongful death action is controlled by the Federal Reservations Act (the Act), Act of February 1, 1928, 45 Stat. 54 (codified at 16 U.S.C. § 457 (1988)), which states that

> In the case of the death of any person by the neglect or wrongful act of another within a national park or other place subject to the exclusive jurisdiction of the United States, within the exterior

boundaries of any State, such right of action shall exist as though the place were under the jurisdiction of the State within whose exterior boundaries such place may be; and in any action brought to recover on account of injuries sustained in any such place the rights of the parties shall be governed by the laws of the State within the exterior boundaries of which it may be.

The principal purpose of this Act was evidently to make wrongful death statutes, which by 1928 had been enacted in all of the states, applicable to federal enclaves where the common law bar against wrongful death actions still controlled. Admittedly the Act requires the court to apply Louisiana state law to plaintiff's wrongful death claim. The parties dispute whether the statute incorporates the whole law of Louisiana, including its choice of law rules, as defendants urge, or only the internal law of Louisiana, as plaintiffs contend. In the alternative, each party proposes various other approaches, including federal choice of law and New York choice of law rules.

## II.

### A.

■ The court will address first whether the Act in providing that the action "shall be governed by the laws" of the state where the accident occurred, here Louisiana, requires the court to apply that state's choice of law rules.

The only two courts that have directly considered the choice of law implications of the Act have reached different conclusions. *See Quadrini v. Sikorsky Aircraft*, 425 F.Supp. 81 (D.Conn.1977); *Jenkins v. Whittaker*, 785 F.2d 720 (9th Cir.1986).

In *Quadrini*, the court held that the Act requires the incorporation of neither the adjacent state's whole law nor its internal law, but leaves federal courts free to apply their own choice of law rules. *Id.* at 87. The court said that the first clause of the Act looks to the adjacent state's law to "remove[ ] the common law bar to the existence of a right of action for wrongful

death," *id.* at 87, while the second clause looks to the that state's "law to determine ... which persons possessed the right created in clause one." *Id.*

The court held that it must resolve all other issues, including choice of law determinations, without reference to the law of the surrounding state. In the words of the court, the Act in "§ 457 should be construed narrowly so as to provide no reference to state law, as a matter of federal law, for deciding issues of liability, nor to contain any implication as to applicable choice of law rules." *Id.*

The court therefore applied federal choice of law rules, interpreting them as governed by the most significant relationship test of the Second Restatement, to determine the applicable state law. *Id.* at 88 & n. 2. Furthermore, the court concluded that that state law should be the law at the time the federal enclave was created, as opposed to that in effect when the claim arose. *Id.* at 88.

In *Vasina v. Grumman Corp.*, 644 F.2d 112 (2d Cir.1981), *aff'g* 492 F.Supp. 943 (E.D.N.Y.1980), the Court of Appeals for the Second Circuit rejected the final conclusion in *Quadrini,* saying

We decline to make *Quadrini* the law of this circuit on this point. If the authors of § 457 had had only the narrow purpose ascribed to them in *Quadrini,* we think that they would have drawn the statute itself more narrowly. The plain language of the provision as drafted, and its later judicial construction, lead us to conclude that § 457 envisions the application of the current substantive law of the surrounding state in actions for death or personal injury occurring within a federal enclave.

*Id.* at 117–18. Although *Vasina* did not consider the choice of law implications of the Act, dicta in the Second Circuit's opinion casts serious doubt on *Quadrini* 's narrow reading of the Act. The court held that "[t]he natural reading of the statutory language is that the wrongful-death law of a federal enclave should be identical to that of the surrounding state, whatever that law might be and however it might change

over time." *Id.* at 117. This court, in its own opinion in *Vasina,* said that

The ordinary meaning of the words used in Section 457 suggests that the purpose of the first sentence was to make the law applicable to wrongful death actions on federal lands consistent with the law applied in the state surrounding the federal lands, while the second sentence was intended to adopt the state law applicable to personal injury actions generally.

492 F.Supp. at 945.

The legislative history of the Act offers no indication that the court should read the Act narrowly. When it reached the floor of the Senate, two Senators engaged in a colloquy to explain its purpose. When Senator Robinson of Arkansas asked for an explanation of the bill, Senator Walsh of Montana responded that the bill was intended to make Lord Campbell's Act apply to places within the exclusive jurisdiction of the United States, and that practically every state had by statute changed what had been the common law to give a right of action to the representatives of a decedent who died as a result of a wrongful act. 69 Cong.Rec. 1486 (1928). He explained that a decedent's representatives had no such right if the Act occurred on federal property. *Id.* The bill, he said, would make state law applicable "so that if under the law of Arkansas a right of recovery could be had if the death occurred outside of the national park, the same right of action would exist if it occurred in the national park." *Id.*

This court finds nothing in the legislative history that indicates that it should read the broad language of the Act narrowly. Its purpose appears to be to create a uniformity between the law to be applied in the federal enclave and that applied in the adjacent state. *Vasina,* 644 F.2d at 117.

As noted above, the only other court to have considered the choice of law issues in the Act has been the Ninth Circuit in *Jenkins v. Whittaker,* 785 F.2d 720, 724 n. 6 (9th Cir.1986), which held without discussion that the Act requires application of the whole law of the state adjacent to the federal enclave. For the reasons discussed

below, this court chooses to adopt the approach of the Ninth Circuit.

### B.

Neither the language nor the legislative history of the Act offers any explicit help in deciding whether the adjacent state's whole law or only its internal law should apply. Since probably all of the states in 1928 applied the same choice of law rule for torts, that is, the place of the tort, it is likely that the legislators did not consider the issue.

Prior to the enactment of the Act, the rule of *lex loci* required that any accident occurring on federal lands be adjudicated according to federal common law rules that did not permit recovery for wrongful death. It does not follow that an Act seeking to correct this problem had a purpose to reject choice of law rules in favor of the direct application of the adjacent state's wrongful death statute. The Act when passed could, if the legislators thought of it, just as easily have been perceived as incorporating the adjacent state's whole law, meaning its conflicts of law rules and its substantive law, with the result that any accident occurring on federal lands would, under *lex loci* rules, be governed by the substantive rules of the adjacent state.

Since Congress did not consider the conflicts of law question, this court must decide which interpretation of the Act is most consistent with its purposes. Concededly Congress passed the legislation to ensure that accidents occurring inside the federal enclave would be treated the same way as those occurring just outside.

This interpretation explains why the Act incorporates the law of the state adjacent to the federal enclave rather than simply imposing a uniform wrongful death statute on all federal lands. Other federal enactments had adopted a uniform statute for accidents involving railway employees, Act of Apr. 22, 1908, c. 149, § 1, 35 Stat. 65 (current version codified at 45 U.S.C. § 51 (1988)), and seamen, Act of Mar. 4, 1915, c. 153, § 20, 38 Stat. 1185 (current version codified at 46 U.S.C.App. § 688 (1988)). There is, after all, a certain unfairness in having an injured party's right depend on whether the injury occurred on or off of the enclave.

This view of the Act is consistent with that of the Court of Appeals in *Vasina.* 644 F.2d at 117. The Court of Appeals for the District of Columbia Circuit, in adopting the Second Circuit's holding in *Vasina,* stated in *Ferebee v. Chevron Chemical Co.,* 736 F.2d 1529 (D.C.Cir.1984), that "[t]he federal act was passed in an effort to put tort victims on federal land on an equal footing with those injured just outside the boundaries of the federal enclave." *Id.* at 1534.

Uniform adjudication of cases concerning accidents occurring inside and outside the federal enclave is best achieved by interpreting the Act as incorporating the whole law of the adjacent state. Perfect uniformity is impossible where there is multistate litigation. But most accidents that occur outside of federal enclaves in Louisiana will be adjudicated in Louisiana courts under the whole law of Louisiana, including its conflicts of law rules.

Plaintiffs point out that if the accident in this case occurred in Louisiana off the federal enclave, then this court would have jurisdiction by reason of diversity of citizenship and would apply New York choice of law rules under the rule enunciated in *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). But that means only that the principle of uniformity in federal and state courts sitting in the same state prevails over the different principle of uniformity enacted in the Act. It is impossible to adopt an interpretation of the Act that would determine in each case which state rules would apply if the accident had occurred off of the federal enclave. The best a court can do is construe the Act to obtain the greatest uniformity of result. That means adopting the whole law of the state adjacent to the federal enclave.

### C.

The Supreme Court's interpretation of the provision of the Federal Torts Claims Act (the Tort Claims Act) suggests that the

Court would adopt the foregoing interpretation of the Act. The Tort Claims Act states that United States will be liable for the torts of federal employees "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Act of June 25, 1948, c. 646, 62 Stat. 933 (current version codified at 28 U.S.C. § 1346 (1988)).

In *Richards v. United States*, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962), the Court was confronted with the question of whether the Tort Claims Act incorporates the whole law or the internal law of the "place where the act or omission occurred." The Court first noted that the legislative history of the Act was not "helpful in solving the problem of the law to be applied in a multistate tort action," since "Congress did not consider choice-of-law problems during the long period that the legislation was being prepared for enactment." *Id.* at 8, 82 S.Ct. at 590. Nevertheless, the Court concluded that the FTCA "requires application of the whole law of the State where the act or omission occurred." *Id.* at 11, 82 S.Ct. at 592.

The Court offered three reasons for this holding. First, it suggested that when a statute incorporates state law, it presumptively adopts that state's whole law in the absence of an indication to the contrary. As the Court said, "[d]espite the power of Congress to enact for litigation of this type a federal conflicts-of-law rule independent of the States' development of such rules, we should not, particularly in the type of interstitial legislation involved here, assume that it has done so." 369 U.S. at 13, 82 S.Ct. at 593.

Second, the Court found that its interpretation would best further the act's goal of "enabl[ing] the federal courts to treat the United States as an individual would be treated under like circumstances." *Id.* at 12, 82 S.Ct. at 592. Finally, the Court noted that some states were implementing new choice of law rules, and it could "see no compelling reason to saddle the Act with an interpretation that would prevent the federal courts from implementing this policy in choice-of-law rules where the State in which the negligence occurred has adopted it." *Id.* at 12–13, 82 S.Ct. at 592–93.

The language of the Act and the Tort Claims Act, enacted only 20 years apart, is similar. The Act states that "the rights of the parties shall be governed by the laws of the [adjacent] State," 16 U.S.C. § 457, while the Tort Claims Act makes the United States liable where it, if a private person, would be liable in accordance with the "law of the place where the act or omission occurred." 28 U.S.C. § 1346.

Both acts incorporate state law, and both sought to create uniformity. This court cannot think of any persuasive reason why the assumption made in *Richards* that the state's whole law should be incorporated should not be made here.

Plaintiff suggests that the interpretation of the Outer Continental Shelf Lands Act (the Shelf Lands Act), Act of Aug. 7, 1953, c. 345, § 3, 67 Stat. 462 (current version codified at 43 U.S.C. § 1332 et seq. (1988)), presents a closer analogy. That act states that the "civil and criminal laws" of the coastal states shall apply to the adjacent seabed. *Id.* at § 1333.

In *Chevron Oil Co. v. Huson*, 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), the Court held that this act required federal courts to apply the internal law and not the conflicts of law rules of the adjacent state. *Id.* at 102–03, 92 S.Ct. at 353. The Court's opinion in *Chevron* is, however, entirely consistent with its interpretation of the Tort Claims Act in *Richards* and this court's view of the Act. The Court offered a clear reason why in the case of the Shelf Lands Act, the assumption of whole law incorporation was inappropriate:

Congress also recognized that the "special relationship between the men working on these artificial islands and the adjacent shore to which they commute" favored application of state law with which these men and their attorneys would be familiar.... If Congress' goal was to provide a comprehensive and familiar body of law, it would defeat that goal to apply only certain aspects of a

state personal injury remedy in federal court.

404 U.S. at 103, 92 S.Ct. at 353 (quoting *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 365, 89 S.Ct. 1835, 1842, 23 L.Ed.2d 360 (1969)); *see also Wooton v. Pumpkin Air, Inc.*, 869 F.2d 848, 851 (5th Cir.1989) (revisiting the conflicts of law issue in the Shelf Lands Act and finding policy of providing familiar law to offshore workers determinative).

No analogous interest exists with respect to the Act. As its legislative history makes clear, the statute was enacted primarily with national parks in mind, and people from all over the country and the world have always visited these parks. The parties and attorneys involved in litigation arising from torts on federal lands will only rarely be familiar with the law of the adjacent state.

For the above reasons, this court finds that the Act requires application of Louisiana conflicts of law rules to this case.

### III.

■ The court now turns to Louisiana choice of law rules to determine whether Louisiana or New York substantive law applies to plaintiff's claims. The laws of the two states differ concerning the right to recover for loss of consortium, and the elements of a damage claim in a wrongful death action.

### A.

Louisiana permits actions for loss of consortium, La.Civ.Code Ann. art. 2315 (West Supp.1990), while New York does not, *Liff v. Schildkrout*, 49 N.Y.2d 622, 632–33, 427 N.Y.S.2d 746, 749, 404 N.E.2d 1288, 1291 (1980). Furthermore, Louisiana appears to be somewhat more expansive in the damages it permits in wrongful death actions than is New York. *Compare Domangue v. Eastern Airlines*, 542 F.Supp. 643, 646 (E.D.La.1982) (allowing damages for "loss of decedent's love and affection and the grief and mental and physical anguish suffered by the survivor") *with Fornaro v. Jill Bros.*, 42 Misc.2d 1031, 1036, 249 N.Y. S.2d 833, 838 (N.Y.Sup.Ct.1964) (excluding

damages for "mental anguish, grief, sorrow, sentiment, or even loss of companionship"). Finally, New York permits damage awards to be reduced to the extent plaintiff receives benefits from collateral sources, N.Y.Civ.Prac.L. & R. § 4545(c) (McKinney 1990), whereas Louisiana does not.

Louisiana follows the Second Restatement of Conflicts of Laws which combines a most significant contacts approach with interest analysis. *Lee v. Ford Motor Co.*, 457 So.2d 193, 194 (La.App.), *cert. den.*, 461 So.2d 319 (La.1984). Section 145 of the Second Restatement indicates four "contacts" that the court should evaluate in tort actions:

(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflicts of Laws § 145. The section states further that these contacts must be evaluated in terms of their "relative importance with respect to the particular issue," and in terms of the principles articulated in § 6 of the Restatement, which are:

(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Id.* at § 6.

The Second Restatement offers additional guidance for selecting the appropriate law to govern wrongful death damage claims. Section 178 states that "[t]he law selected by application of the rule of § 175 determines the measure of damages in an action for wrongful death." *Id.* at § 178. Section 175 in turn states that:

In an action for wrongful death, the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

*Id.* at § 175.

The Second Restatement thus creates a presumption in wrongful death cases that the law of the place of injury will apply unless another state has a more significant interest. *Foster v. United States,* 768 F.2d 1278, 1280 (11th Cir.1985).

The commentary to § 175 explains that "[t]he extent of the interest of each of the potentially interested states should be determined on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules and of the particular issue involved." *Id.* at comment d. The commentary to § 178 indicates, therefore, that "[t]he state of conduct and injury will not, by reason of these contacts alone, be the state which is primarily concerned with the measure of damages in a wrongful death action." *Id.* at § 178 comment b.

## B.

The evaluation of plaintiff's claims is somewhat hampered by the sparsity of Louisiana authority. The cases present, in addition, a wide variety of factual situations.

Louisiana is indisputably the place of injury and the place where the relationship between the plaintiff and defendants was centered. New York was the state of domicile of the plaintiff and the decedent, and thus of their marriage. All other contacts were with states other than New York or Louisiana.

■ Plaintiff and the decedent were concededly domiciliaries of New York before and at the time of their marriage in 1982. Although the two lived in New York for only two days as a married couple before departing for Germany and then Louisiana, the law of Louisiana establishes that a party's domicile does not change as a result of military assignment, even for a prolonged period, to a different country or state. *See* La.Civ.Code Ann. art. 46 (West 1952) ("Domicile once acquired shall not be forfeited by absence on business of the State or of the United States"); *Howard v. Howard,* 499 So.2d 222 (La.Ct.App.1986) ("A member of the military is presumed to retain the domicile of his home state"). Louisiana law states that a minor child has the same domicile as his parents. La.Civ. Code Ann. art. 39 (West Supp.1990).

Louisiana's rule of domicile is consistent with the view of the Second Restatement, which states that "[a] person does not usually acquire a domicil of choice by his presence in a place under physical or legal compulsion." Restatement (Second) of Conflicts of Laws § 17 (1988 Revisions).

In the commentary to § 17, the Second Restatement suggests that a member of the armed services may, in certain circumstances, acquire the domicile of the place where he is stationed, but only if he regards that place as his home. *Id.* at comment c. The comment states further that "[s]uch an attitude on his part may be difficult to establish in view of the nomadic character of military life and particularly if he intends, upon the termination of his service, to move to some other place." *Id.*

The decedent left New York solely as a result of military assignments to Germany and Louisiana. Plaintiff and the decedent had social and other contacts with the local community in Louisiana, but the record contains nothing that shows that they intended to make Louisiana their permanent home. Rather, they intended to move back to New York after his discharge from the Air Force.

Plaintiff's return to New York after decedent's death tends to confirm this intention. While the military did not require plaintiff to accompany her husband to Germany and Louisiana, there is no evidence that she proposed to change domicile as a result of these moves. Since the couple never changed their domicile, their son was also a domiciliary of New York.

The court must evaluate these contacts according to their importance to each particular issue and to the principles listed in § 6 of the Second Restatement.

Louisiana's only interest, as the site of the injury, is in deterrence. Since the issue here is damages and not liability, however, that interest is considerably diminished. Deterrence would be promoted only incrementally by having Louisiana's more favorable damage rules apply. *See Gordon v. Eastern Air Lines*, 391 F.Supp. 31, 33 (S.D.N.Y.1975) ("Since the issue of defendant's conduct is not here involved, Florida has no interest in the application of its law to the narrow issue of damages before the court simply because the accident occurred within its borders."); *Bryant v. Silverman*, 146 Ariz. 41, 703 P.2d 1190, 1194 (1985) ("Although Colorado is the state of injury, the state where the injury occurs does not have a strong interest in compensation if the injured plaintiff is a non-resident.").

Where courts have applied the law of the place of injury, the issue has often been liability as opposed to damages. *See Jenkins v. Whittaker Corp.*, 785 F.2d 720 (9th Cir.1986); *Wert v. McDonnell Douglas Corp.*, 634 F.Supp. 401 (E.D.Mo.1986); *Quadrini v. Sikorsky Aircraft*, 425 F.Supp. 81 (D.Conn.1977).

New York, on the other hand, has a significant interest in how its citizens will be compensated. As the court in *Bryant* stated, "[c]ompensation of an injured plaintiff is primarily a concern of the state in which plaintiff is domiciled." *Id.*

Plaintiff's claims, moreover, are based on her marital relationship to decedent. The domicile of the couple should therefore weigh more heavily than the place of the injury.

In *Card v. American Brands Corp.*, 401 F.Supp. 1186 (S.D.N.Y.1975), a couple domiciled in Oregon brought a loss of consortium claim for injuries sustained in Virginia while the husband "was temporarily on official Navy duty." *Id.* at 1187. Although Oregon had no other contacts to the parties or the occurrence, the court concluded that "Oregon, the state of the marital domicile, is more properly the state whose law governs the substantive claim of the husband for loss of his wife's consortium. The claimed injury is to the marriage—an incident of Oregon." *Id.* at 1188 (citations omitted).

Certain courts have held that states have interests only in enhancing the position of their domiciliaries. Thus in *Foster v. United States*, 768 F.2d 1278 (11th Cir.1985), the court declined to apply Florida law to a wrongful death claim by Florida domiciliaries arising out of a plane crash in Wisconsin because that law would have been less favorable to the plaintiffs. As the court explained, "[l]imiting potential beneficiaries limits recovery. The only purpose is to protect defendants. When there is no domiciliary defendant, this interest should be discounted." *Id.* at 1283; *see also Guillory v. United States*, 699 F.2d 781 (5th Cir.1983) (applying Louisiana law in part because more favorable to Louisiana plaintiffs).

The court in *Gordon v. Eastern Air Lines*, 391 F.Supp. 31 (S.D.N.Y.1975), however, rejected this view. The case involved a wrongful death action by New York domiciliaries as a result of a plane crash in Florida. Although Florida law would have been more favorable to the plaintiffs, the court found that New York's interest was greater and applied its law. The court explained that "[i]t is not New York's policy to *enhance* the recovery of its residents by the application of a more favorable foreign rule." *Id.* at 34 (emphasis in original).

A number of courts have taken the same approach with respect to loss of consortium claims. *See Felch v. Air Florida*, 562 F.Supp. 383 (D.D.C.1983) (applying Virginia law denying loss of consortium claim to Virginia domiciliaries and residents injured in District of Columbia); *Stutsman v. Kaiser Found. Health Plan*, 546 A.2d 367 (D.C.App.1988) (Virginia as situs of marital domicile important factor in deciding to apply Virginia law denying loss of consortium claim).

 The court finds this approach to be the better interpretation of the Second Restatement rules. A state's interest is not

merely that which will bring its citizens the greatest benefits. Indeed, it would be anomalous for New York to insist on greater benefits for its plaintiffs abroad than it allows them at home. Likewise, the court does not consider, nor have the parties suggested, whether the defendants' domicile states have a policy favorable to its citizen.

The court concludes, therefore, that Louisiana's interest in the level of damages resulting from an accident that occurred within its borders is minimal where there are no other contacts. New York has a more significant interest which overcomes the presumption that Louisiana law applies. Therefore, the court concludes that New York law applies to the plaintiff's loss of consortium claim and damage claims for wrongful death.

So ordered.